CITY OF BEVERLY & another[1] *vs.* CIVIL SERVICE COMMISSION & another.[2]

No. 09-P-1959.

Essex. June 4, 2010. - October 28, 2010.

Present: GREEN, DREBEN, & MILKEY, JJ.

*Municipal Corporations,* Police. *Civil Service,* Decision of Civil Service Commission, Judicial review, Police. *Public Employment,* Police. *Practice, Civil,* Review respecting civil service. *Administrative Law,* Judicial review.

Discussion of the standard of judicial review of a decision of the Civil Service Commission regarding an action taken by an appointing authority. [187-188]

The Civil Service Commission (commission) erred in concluding that an appointing authority (city) improperly excluded a candidate from consideration for a police officer position on the basis of information that the candidate previously had been fired for alleged serious misconduct, where the commission assigned to the city an erroneous evidentiary burden (i.e., requiring the city to prove that the candidate engaged in the alleged misconduct), and where the city, having conducted an impartial and reasonably thorough review that confirmed that there appeared to be a credible basis for the allegations, demonstrated that it had a reasonable justification for bypassing the candidate. [188-192]

CIVIL ACTION commenced in the Superior Court Department on September 8, 2008.

The case was heard by *John T. Lu,* J., on motions for judgment on the pleadings.

*Jason R. Powalisz* for Sean Bell.

*Daniel B. Kulak (Robert A. Munroe* with him) for the plaintiffs.

*David Hadas,* Assistant Attorney General, for Civil Service Commission, submitted a brief.

*Philip Collins & Daniel C. Brown,* for Massachusetts Municipal Association, amicus curiae, submitted a brief.

---

[1] Beverly police department.

[2] Sean Bell.

MILKEY, J. Having taken the relevant civil service examination, the defendant Sean Bell applied for a position as a reserve police officer with the city of Beverly (city).[3] The city excluded Bell from consideration because it learned that he recently had been fired from his job as a hospital security guard allegedly for improperly having accessed the voice mail accounts of other employees. Bell appealed to the Civil Service Commission (commission) pursuant to G. L. c. 31, § 2(*b*). Through a three-to-two decision, the commission ruled in his favor, with the majority concluding that the city had not carried its burden of proving that Bell had in fact engaged in the misconduct for which he had been fired. A Superior Court judge vacated the commission's ruling after concluding that the commission improperly had substituted its judgment for that of the city, and Bell appealed. We affirm.[4]

*Background.*[5] In 2006, personnel at Beverly Hospital (the hospital) became suspicious that someone was obtaining unauthorized access to the voice mail accounts of certain employees. They set up a surveillance camera to film the area around the telephone station that they believed was being used for this purpose. On June 13, 2006, hospital officials confronted Bell about breaches to the system that they concluded had occurred the previous day. According to them, the surveillance photographs showed Bell, and no one else, in the vicinity of the telephone from which the calls were made at the time they were made. The hospital immediately suspended Bell without pay, explaining in detail why it was doing so. After the meeting, hospital personnel reviewed the telephone and camera records from earlier that day (the morning of June 13, 2006), and again concluded that there was a match. By letter dated July 15, 2006, the hospital terminated Bell from his position, again recounting in detail why it was doing so. The letter explained: "Intentionally accessing the

---

[3]We refer to the city and its police department collectively as the city, except where necessary for clarity.

[4]We acknowledge the amicus brief filed by the Massachusetts Municipal Association in support of the city.

[5]The factual statements below are taken largely from the commission's factual findings, which the parties acknowledged at oral argument they are not challenging. We have supplemented those findings by reference to the written exhibits that were before the commission. Those exhibits appear in the administrative record, which we obtained from the Superior Court on our own initiative.

private voicemail system of another person is a serious confidentiality breach, an invasion of the privacy of other employees, as well as potentially a violation of the law." We have no evidence before us that Bell ever challenged his summary termination from his security guard job, which at that point he had held for some four years.

The Beverly police department had multiple openings for reserve police officers in 2006, and the police chief assigned Captain John DiVincenzo to conduct background checks on the eligible candidates, including Bell. Hospital officials informed Captain DiVincenzo why Bell had been fired. When Captain DiVincenzo confronted Bell with this information in August of 2006, Bell denied having accessed the voice mails. Following this meeting, Captain DiVincenzo met with hospital officials who explained how they came to the conclusion that Bell was the one who had improperly accessed the voice mail accounts. They supplied Captain DiVincenzo with the surveillance photographs and a "call search report" that documented the voice mail accounts being accessed and the telephone extensions used to access those accounts. This report included print-outs generated by the hospital's computerized "voice mail server." Because he lacked a technical understanding of voice mail systems, Captain DiVincenzo passed the hospital's information along to Russell Fisk, an information technology specialist who worked for the city. Fisk prepared a report that concluded:

> "The logs do illustrate one extension calling and accessing multiple voice mail boxes, many in the Human Resources department. The call times in the voice mail log do closely match the photographs of the security guard. [Beverly Hospital] had indicated that the telephone extension used to access the voice mail is the one shown in the photographs."

Fisk's report also noted that two of the thirteen calls in question were made from extensions outside the system and that the hospital "records do not conclusively prove that *these calls* were indeed by [Bell]" (emphasis added).[6]

Armed with this detailed information, Captain DiVincenzo

---

[6]Read in context, Fisk's reference to "these calls" plainly refers to the two calls that were made from outside extensions. It appears that the commission

confronted Bell again. Bell admitted that the photographs were of him but again denied the misconduct. When pressed to explain the evidence against him, Bell stated that the hospital must have "forensically altered" the photographs. He suggested that the hospital may have targeted him in retaliation for his union activities or his cooperation with police in some sort of past investigations at the hospital. Captain DiVincenzo informed Bell that absent proof that disputed the documents, he would recommend to the police chief that Bell not be hired. Captain DiVincenzo did in fact provide that recommendation after concluding that "Bell was unable or unwilling to give any substantial explanation of the pictures and documents surrounding [the] incident." Relying on Captain DiVincenzo's representations and Fisk's report, the police chief decided to bypass Bell and informed him that his name was being withdrawn from consideration. Bell filed a timely appeal with the commission on June 7, 2007.

At an evidentiary hearing held on February 7, 2008, the commission heard testimony from five witnesses: Bell, Captain DiVincenzo, the police chief, Henry McLaughlin (security manager at the hospital), and Greg Buckless (information technology supervisor at the hospital). Captain DiVincenzo explained the process he used, as set forth above. Although a transcript of his testimony is not before us,[7] it is evident from the commission's findings that Captain DiVincenzo exhibited uncommon caution in trying not to overstate the extent of his own personal knowledge. Thus, for example, the commission noted that Captain DiVincenzo "does not know whether the photographs depict [Bell] or another person," despite the fact that Bell had admitted that the photographs were of him.[8] Captain DiVincenzo also stated that the hospital records did not "indicate to him that any person ever actually illegally accessed voicemail." He readily acknowl-

may not have read the quoted language with this limiting gloss. Moreover, the fact that the majority highlighted this passage in support of its ruling suggests that they may have believed that "conclusive" proof was required.

[7]Apparently neither party requested that the transcript of the evidentiary hearing be made part of the administrative record that was filed in the Superior Court. See Superior Court Standing Order 1-96(2).

[8]Notwithstanding Bell's concession on this point, the commission went out of its way to note that "no Appointing Authority witness ever testified that the [surveillance photographs] depicted [Bell]."

edged that he lacked a technical understanding about how the hospital's voice mail system worked and "that he relied entirely on the pictures and report and took the [h]ospital's representations at 'face value' that [Bell] had accessed voicemails."[9]

Buckless, the information technology supervisor at the hospital, acknowledged "that the extensions allegedly used to improperly access voicemails could also be dialed from any location in the [h]ospital, as the extensions are not tied to a specific phone." Although the commission in its brief portrays this as a key concession that "essentially guts the case against Bell," the commission does not actually explain why that is.[10]

In his own testimony, Bell denied the misconduct and stated that he could not have gained access to the voice mail accounts because he lacked the necessary knowledge to do so (e.g., the passwords necessary to access them). He also testified about his union-related activities, which he again offered as a possible explanation for the hospital having targeted him.

A three-person majority of the commission concluded that the city "failed to prove that [Bell] illegally accessed voicemails of employees while employed at the [h]ospital, the reason given for his bypass, and accordingly did not support this reason by the necessary preponderance of the evidence." The commission

[9]According to the commission's findings, Captain DiVincenzo "testified that the camera times in the photographs are sometimes different from the alleged improper voicemail access times noted in the call search report." There is no discussion in the commission's decision of whether this testimony is at variance with the city's information technology specialist's report, which concluded that the call times "closely match[ed]" those of the photographs.

[10]At least as recounted in the commission's findings, Buckless's testimony on this point appears to be of uncertain import. Whether the relevant extensions (be they the extensions of the telephone that Bell allegedly used or the extension of the voice mail accounts that were accessed) could have been "dialed" from any telephone extension in the hospital never appears to have been in dispute. Instead, the key factual question before the commission was whether one could use a telephone elsewhere in the hospital to dial the extension that Bell allegedly used and — once this had been done — then access the voice mail accounts of others, all in a manner such that the voice mail server would record the intermediary extension as the originating extension of the call, instead of the extension of the telephone that the caller was actually using. If so, then the evidentiary bite of the hospital's "call search report" would indeed have been diminished. It is far from clear that Buckless's testimony established this to be the case (as opposed to merely acknowledging facts that were not in dispute).

therefore ruled in Bell's favor and ordered the city to place Bell "at the top of the next certification list for the position of permanent Reserve Police Officer." Two commissioners dissented. They concluded that the city had shown a valid justification for bypassing Bell and that "the [c]ommission . . . applied the wrong standard in this case, by requiring that the [c]ity 'prove' that [Bell] accessed the voicemails at Beverly Hospital, leading to his termination." In vacating the commission's decision, the Superior Court judge largely tracked the reasoning of the dissent.

*Discussion.* We begin by addressing the respective roles of the appointing authority and the commission, and the appropriate standard of review to be employed by courts sitting in review of their decisions. All parties agree that the city could bypass Bell if it had a "reasonable justification" to do so. See *Brackett* v. *Civil Serv. Commn.*, 447 Mass. 233, 241 (2006). Under established case law, the city bore the burden of establishing by a preponderance of the evidence that it had such a reason. *Ibid.*, citing *Massachusetts Assn. of Minority Law Enforcement Officers* v. *Abban*, 434 Mass. 256, 260 (2001), and *Cambridge* v. *Civil Serv. Commn.*, 43 Mass. App. Ct. 300, 303 (1997). This means that it needed to demonstrate that its decision was "done upon adequate reasons sufficiently supported by credible evidence, when weighed by an unprejudiced mind, guided by common sense and by correct rules of law." *Ibid.*, quoting from *Selectmen of Wakefield* v. *Judge of First Dist. Ct. of E. Middlesex*, 262 Mass. 477, 482 (1928).

In its review, the commission is to find the facts afresh, and in doing so, the commission is not limited to examining the evidence that was before the appointing authority. *Leominster* v. *Stratton*, 58 Mass. App. Ct. 726, 727 (2003). "The commission's task, however, is not to be accomplished on a wholly blank slate." *Falmouth* v. *Civil Serv. Commn.*, 447 Mass. 814, 823 (2006). Its role is to "decide[] whether 'there was reasonable justification for the action taken by the appointing authority in the circumstances found by the commission to have existed when the appointing authority made its decision.' " *Id.* at 824, quoting from *Watertown* v. *Arria*, 16 Mass. App. Ct. 331, 334 (1983). The commission's role, while important, is relatively narrow in scope: reviewing the legitimacy and reasonableness of the appointing authority's actions. See *id.* at 824-826. Although it

is plain that the finding of the facts is the province of the commission, not the appointing authority, the commission owes substantial deference to the appointing authority's exercise of judgment in determining whether there was "reasonable justification" shown.[11] Such deference is especially appropriate with respect to the hiring of police officers. In light of the high standards to which police officers appropriately are held,[12] appointing authorities are given significant latitude in screening candidates, and "[p]rior misconduct has frequently been a ground for not hiring or retaining a police officer." *Cambridge* v. *Civil Serv. Commn.*, 43 Mass. App. Ct. at 305, and cases cited.

A court reviewing a decision made by the commission is "bound to accept the findings of fact of the commission's hearing officer, if supported by substantial evidence." *Leominster* v. *Stratton*, 58 Mass. App. Ct. at 728. All parties have accepted the commission's factual findings as far as they go, and we accept them as well.[13] "The open question on judicial review is whether, taking the facts as found, the action of the commission was legally tenable." *Ibid.*

The parties agree that if Bell in fact accessed the voice mail accounts in question, that would be a sufficient reason for the city to bypass him for a position as a police officer. They disagree on what the city needed to show given that there is a factual contest whether Bell ever engaged in the misconduct. The dispute is thus not whether the city relied on improper considerations, but whether the city put forward a sufficient quantum of evidence to substantiate its legitimate concerns.[14] We next turn to that question.

---

[11]As demonstrated *infra*, this case well illustrates the difficulties inherent in sorting out what is fact finding (the province of the commission) and what is the exercise of judgment with regard to the facts (the province of the appointing authority).

[12]The position of a police officer is one "of special public trust." *Police Commr. of Boston* v. *Civil Serv. Commn.*, 22 Mass. App. Ct. 364, 372 (1986). "Police officers must comport themselves in accordance with the laws that they are sworn to enforce *and* behave in a manner that brings honor and respect for rather than public distrust of law enforcement personnel." *Id.* at 371. See *Boston* v. *Boston Police Patrolmen's Assn.*, 443 Mass. 813, 823 (2005).

[13]Moreover, neither party has supplied a transcript of the testimony that the commission heard, and without that, we would be unable to evaluate any claim that the findings are unsupported by substantial evidence.

[14]Neither Bell nor the commission has ever claimed that the city's stated

During its investigation, the city uncovered the undisputed fact that Bell had been fired for alleged serious misconduct. The experienced police captain who conducted the background check did not stop there, but met with hospital officials to glean the basis of their belief that Bell had in fact engaged in the misconduct. Aware that he personally lacked the expertise to evaluate the hospital's evidence, the captain called in someone who did. The city's information technology specialist reviewed the hospital's records and prepared a report that documented that these records were consistent with the conclusions that the hospital officials drew from them (while understandably relying on representations by the hospital as to those facts not disclosed by the records). In other words, the city's review confirmed that the hospital's reasons for firing Bell appeared to have a credible basis in fact. In addition, Captain DiVincenzo provided Bell two opportunities to explain his side of the story and to counter the hospital's evidence months after Bell had been informed of the reasons why he was fired. The best that Bell could come up with during these sessions was to suggest that his union organizing activities had become such an irritant to hospital officials that they decided to frame him by falsifying the surveillance photographs.

In sum, having uncovered that Bell was fired for allegedly engaging in serious misconduct, the city conducted an impartial and reasonably thorough review that confirmed that there appeared to be a credible basis for the allegations. The city therefore was able to show that it had legitimate doubts about Bell's suitability for such a sensitive position and, in our view, demonstrated that it had a "reasonable justification" for bypassing Bell.

reason for bypassing Bell was a subterfuge designed to mask improper motives such as "political considerations, favoritism, and bias in governmental hiring and promotion." *Massachusetts Assn. of Minority Law Enforcement Officers* v. *Abban,* 434 Mass. at 259, citing *Cambridge* v. *Civil Serv. Commn.,* 43 Mass. App. Ct. at 304. Thus, this case does not raise the most significant concerns that the commission was created to address, and greater deference to the local appointing authority is warranted. See *Falmouth* v. *Civil Serv. Commn.,* 447 Mass. at 824. Nonetheless, the commission has an important role to play "to ensure decision-making in accordance with basic merit principles." *Massachusetts Assn. of Minority Law Enforcement Officers* v. *Abban, supra* at 264. As the commission points out in its brief, "merit principles" could be undermined if an appointing authority bypasses a qualified candidate who had been wrongly accused of misconduct.

Instead of focusing on whether the city had carried its burden of demonstrating a "reasonable justification," the commission focused on whether the city had proved that Bell in fact engaged in the misconduct. We believe the commission erred as a matter of law in placing such an added evidentiary burden on the city. In simple terms, neither Bell nor the commission has presented a convincing argument that the Legislature intended to force an appointing authority to hire a job applicant for such a sensitive position unless it is able to prove to the commission's satisfaction that the applicant in fact engaged in the serious alleged misconduct for which he was fired.[15]

Moreover, we believe that the commission's position that the city must hire Bell unless it can prove the truth of the third-party allegations would force the city to bear undue risks. In this respect, *Cambridge* v. *Civil Serv. Commn.*, 43 Mass. App. Ct. at 301, is instructive. There, an applicant for a police position had long ago engaged in certain misconduct. Recognizing that hiring the applicant posed a risk, we concluded that "[w]hether to take such a risk is, however, for the appointing authority to decide." *Id.* at 305. Although the context presented here obviously differs in that the parties dispute whether the past misconduct ever occurred, the risks presented are similar. After completing its own independent review, the city decided that it was unwilling to bear

[15]The commission initially declined to submit a brief. In light of the substantial deference owed to an agency interpretation of a statute it administers, see *Provencal* v. *Commonwealth Health Ins. Connector Authy.*, 456 Mass. 506, 514 (2010), we invited the commission to submit a brief, and it accepted that invitation. The commission's brief principally focuses on the facts, not on how the underlying statute should be interpreted. The commission does appear to take the position that the city faced the specific burden of proving the truth of the third-party allegations of misconduct. However, it does little to attempt to support that position based on the case law, the language of the statute, or other considerations. Moreover, elsewhere in its brief, the commission appears to concede that there may well be some situations where an appointing authority would be justified in bypassing a candidate based on prior misconduct without having to prove to the commission that the applicant in fact engaged in the misconduct, e.g., "where a candidate has been convicted of a crime or found responsible for some other type of misconduct by a court or governmental body." In any event, to the extent that the commission interprets an appointing authority's over-all burden to prove a "reasonable justification" as encompassing a specific burden of proving the truth of third-party allegations of misconduct, we consider that an unreasonable interpretation to which deference is not due.

the risks of hiring Bell. Absent proof that the city acted unreasonably, we believe that the commission is bound to defer to the city's exercise of its judgment.

We discern no conflict between our reasoning here and that of *Leominster* v. *Stratton*, 58 Mass. App. Ct. at 732-733. That case involved a city's termination of a tenured police officer who had been accused of sexually abusing his daughter and stepdaughter.[16] The commission reinstated the officer after concluding that the evidence demonstrated that the allegations were in fact false. *Id.* at 729-731. A Superior Court judge vacated the commission's order. We reversed, concluding that the Superior Court judge should have deferred to the commission's finding of the facts. We distinguished *Cambridge* v. *Civil Serv. Commn.*, *supra*, by noting that the misconduct there was undisputed, while in *Leominster* v. *Stratton*, the commission found that "the facts justifying [the city's action] did not exist." 58 Mass. App. Ct. at 732-733. Bell argues that the commission here similarly determined that he was falsely accused and that *Leominster* v. *Stratton*, *supra*, therefore dictates that the commission's decision be affirmed. We disagree.

The context presented in *Leominster* v. *Stratton*, *supra* at 726, was significantly different. That case involved the discipline of a tenured employee, not an initial hiring decision. *Ibid.* Therefore, the appointing authority in that case had to demonstrate that it had acted with "just cause" to fire its employee (see G. L. c. 41, § 43), not merely that there was "reasonable justification" to bypass a job candidate. We think that the standards are materially different. Simply put, a municipality should be able to enjoy more freedom in deciding whether to appoint someone as a new police officer than in disciplining an existing tenured one.

Further, it bears noting that in *Leominster* v. *Stratton*, the commission found — after two rounds of evidentiary hearings — that the allegations of misconduct were demonstrably false, having been fabricated by the police officer's former wife. *Id.* at 730. By contrast, although a majority of commissioners here

[16]Although we did not expressly note that the police officer in *Leominster* v. *Stratton* had obtained tenure, that status is evident from the fact that his termination proceedings were conducted under the provisions applicable to tenured employees. 58 Mass. App. Ct. at 726-727, citing G. L. c. 31, §§ 41, 43.

concluded that Bell was a credible witness, they appear in the end to have found the evidence inconclusive and ultimately rested their ruling on the city's failure to prove that the allegations of misconduct were in fact true, a burden that we have concluded the commission erroneously assigned to the city.[17]

In sum, we agree with the judge below that the city demonstrated a reasonable justification to bypass Bell and that the commission improperly substituted its judgment for that of the city in ordering that he be hired.

*Judgment affirmed*

---

[17]Nor is this a case where the individual who allegedly engaged in misconduct successfully confronted the allegations in separate proceedings in which the truth of the allegations was directly at issue. Compare *Lynn* v. *Thompson*, 435 Mass. 54, 55, 58 (2001) (upholding arbitration order reinstating police officer who had been discharged for allegedly using excessive force, where arbitrator rested in part on the officer having been "exonerated" in separate civil proceedings). As noted above, there is no evidence that Bell ever sought to challenge the hospital's summary termination of him.