Troy, Paul E., J.
The Boston Police Department (“BPD”), appeals pursuant to G.L.c. 31, §44 and G.L.c. 30A, § 14, from a decision of the defendant Civil Service Commission (“Commission”) to place Ida Candreva (“defendant”) at the top of the next certification list to be a Boston police officer. This matter is now before the court on the parties’ Cross Motions for Judgment on the Pleadings. For the following reasons, BPD’s Motion is DENIED and the defendants’ Motion is ALLOWED.
BACKGROUND
In 2005, defendant Candreva took an open examination to become an officer with the Boston Police Department. Based on the examination scores, BPD published certifications for the position on December 14, 2005. The defendant’s name appeared fifth on a special certification issued for people who speak the Cape Verdean language. The BPD selected nine people from the list to become police officers. The defendant was bypassed, however, because the Department determined she had not been fully truthful when making required disclosures as part of a health evaluation.
The defendant has significant experience in the law enforcement field. From April 2003 to May 2004, she worked as a victim witness advocate for the Suffolk County District Attorney’s Office. At the time of her application, she was working as a civilian domestic violence advocate and social worker for BPD. She is currently serving as an MBTA police officer. At a hearing before the Commission, both Boston police detectives and a Suffolk County ADA testified to her veracity and good character.
On January 3, 2006, the BPD’s Director of Human Resources, Robin Hunt, sent the defendant an employment offer contingent on her passing a medical and psychological evaluation and her being high enough on the civil service certification to be selected. This was, in fact, the defendant’s second evaluation by BPD, as she had previously submitted to a health evaluation on May 4, 2004 as part of her successful application to work with the department as a social worker.
As the first part of the evaluation process, BPD applicants are required to fill out an extensive health questionnaire. This questionnaire consists of a large number of “yes” or “no” questions, followed by space to explain any “yes” answers. Although she had previously filled out a similar questionnaire for her 2004 job application, the defendant did not have a copy of this questionnaire with her when she filled the 2006 questionnaire out a second time. AR Vol. 1 at 310. The defendant submitted the questionnaire to BPD on January 17, 2006. She answered “yes” to a number of yes/no questions, including: #22 (back injury); #129 (low back pain); #144 (neck pain); #192 (strains/sprains); #243 (have you ever injured your back); #246 (advice to potentially have operation for *438 back); #249 (limitation on work due to back injury); and #250 (time lost at work due to back injuiy).
In the addendum to the 2006 questionnaire explaining her back injuries, the defendant wrote: “Had sprained a muscle @ work for improperly lifting missed 1 daywork; advised of light duty.” She had previously stated in the addendum to the 2004 questionnaire that “In june 2002, I re-injured my back at work while lifting luggages; stayed out of work for about 3 or 4 months and then was cleared to go to work, was seen by a doctor for work injury and scoliosis.” In the 2004 addendum, the defendant had also mentioned suffering a minor head injuiy when a vase fell on her head in October 2003. Although she had three stitches and headaches, she did not lose consciousness and does not mention missing work. The defendant claimed not to have suffered head injuries in her 2006 questionnaire.
The defendant underwent a psychiatric screening and evaluation with Dr. Marcia Scott on Januaiy 19, 2006, following which Dr. Scott certified that the defendant did not have any psychological condition that would prevent her from serving as a Boston police officer. Scott’s notes indicate that they discussed her 2002 back injury and “disenrollment” from ROTC.
The next step in the defendant’s application process was a medical evaluation with Nurse Zelma Greenst-ein on Januaiy 22, 2006. Greenstein found the defendant’s physical condition to be generally normal and made brief notes of her medical history, including her back injuiy. Greenstein also noted that she was requesting all of the defendant’s medical records because of her histoiy of back and neck injuries. Greenstein did not note any discrepancies between the defendant’s 2004 and 2006 questionnaires in her notes.
At some point shortly after the examination Greenstein, who was in possession of some of the defendant’s medical records[2] and 2004 questionnaire, alerted Roberta Mullan, the Director of BPD’s Occupational Health Services Unit, about several possible discrepancies between them. Mullan and Greenstein then together reviewed both the questionnaire and all of the defendant’s medical records. Both concluded that the defendant had attempted to willfully deceive the BPD, and as a result Mullan sent a letter outlining their concerns to Robin Hunt, BPD’s director of human resources. The letter was dated Januaiy 22, the same day as the defendant’s medical exam, although Greenstein testified that it was possible that the letter was in fact written a bit later. In any case, in her letter Mullan identified three areas where she concluded the defendant had deliberately failed to fully disclose her histoiy.
First, Mullan noted that the defendant had stated in the questionnaire that she had never been rejected by the militaiy.[3] However, during her psychological interview with Dr. Scott, she had said she had been discharged from the Reserve Officer Training Corps (ROTC) due to a back condition. Second, Mullan cited the head injuiy that the defendant had mentioned in her 2004 questionnaire but not in her 2006 questionnaire. Finally, noting the discrepancy between the 2004 and 2006 questionnaires, Mullan maintained that the defendant had attempted to minimize the severity of her 2002 back injuiy in order to strengthen her application.
In February 2006, BPD’s Recruit Investigation Unit assigned Detective Famolare to conduct an investigation of the defendant. Famolare requested employment records from the period after the defendant’s back was injured in 2002, which she provided to him on February 20, 2006. The defendant’s fate was then decided at a series of two “roundtable” discussions by BPD officials.[4] Neither Greenstein nor Mullan were present, but Hunt and her colleagues agreed with their conclusions and decided to bypass the defendant due to her purported dishonesty. They did not request the documents obtained by Famolare. On April 27, 2006, Hunt wrote the Director of the Organizational Development Group of the Human Resource Division requesting permission to bypass the defendant for hiring, referencing Mullan’s Januaiy 22 letter to Hunt as justification.
The Human Resources Department approved Hunt’s request, and BPD informed the defendant by letter of the bypass on June 6, 2006. The defendant appealed this decision to the Civil Service Commission pursuant to G.L.c. 31, §43 on August 4, 2006. The Commission conducted a hearing on the matter on three separate days: November 7, 2007, February 8, 2007 and April 15, 2008, and heard testimony from Hunt, Mullan, and Greenstein, as well as the defendant and her character witnesses.
At the hearing, the defendant testified that Greenst-ein had given her “odd looks” during the medical review, and then told her “I’m going to make sure you don’t get on.” A short time later, the defendant says that she repeated this statement. Greenstein denied ever making this statement. The Commission’s hearing examiner found the defendant’s demeanor to be more credible than Greenstein’s. The examiner also noted certain discrepancies in Greenstein’s testimony that in his mind called it into question. Combined, these led him to conclude that Greenstein’s efforts to raise concerns about the defendant’s veracity were motivated, at least in part, by some unspecified dislike. The examiner further determined that, although the defendant had made mistakes in the long questionnaire, they were “minor and done unintentionally.” He finally found that neither Mullan nor Hunt had given the defendant any opportunity to explain the discrepancies between her 2004 and 2006 questionnaires, and had rushed to judgment, relying too heavily on Greenstein’s opinion of the evidence.
*439 The full Commission adopted the hearing examiner’s recommendation and rendered its decision in favor of the defendant on January 16, 2009. The Commission ordered that the defendant be placed on top of any existing certification (or the next certification) requested by the BDP for appointment to the position of police officer. It also forbade Greenstein from participating in any further proceedings with respect to the defendant, forbade BPD from using the reasons stated in its original bypass request in any additional request for bypassing the defendant, and ordered that any future bypass of the defendant be supported by audio or visual recordings of any interviews, examinations, or meetings regarding her candidacy.
DISCUSSION
The Commission’s task is to determine whether the appointing authority had met its burden, by a preponderance of the evidence, that its actions were reasonably justified. Brackett v. Civil Serv. Comm’n, 447 Mass. 233, 241 (2006). For an appointing authority’s action to be “justified,” it must be “done upon adequate reasons sufficiently supported by credible evidence, when weighed by an unprejudiced mind, guided by common sense and by correct rules of law.” Cambridge v. Civil Serv. Comm’n, 43 Mass.App.Ct. 300, 304 (1997). The Commission owes an appointing authority’s exercise of judgment “substantial deference.” Beverly v. Civil Serv. Comm’n, 78 Mass.App.Ct. 182, 188 (2010).
On the other hand, the Commission is tasked with finding facts afresh, and is not limited to the evidence before the appointing authority. Leominster v. Stratton, 58 Mass.App.Ct. 726, 727 (2003). “The reviewing court is . . . bound to accept the findings of fact of the commission’s hearing officer, if supported by substantial evidence,” Id. at 728, and should not substitute its judgment for the Commission's, Brackett, 447 Mass. at 241. This court, then, must generally defer to the Commission’s findings of fact, but also to BPD’s judgment in applying the facts. See Beverly, 78 Mass.App.Ct. at 188 n.11.
It does not appear to be disputed between the parties that it would have been a valid exercise of BPD’s discretion to bypass the defendant if she in fact attempted to deliberately mislead BPD as to the state of her health, as honesty is indeed a crucial trait in any police officer.[5] Rather, the question is whether the Commission’s determination that she did not attempt to mislead BPD during the course of her health evaluation (and indeed, was the victim of bias on the part of its health examiner) was backed by substantial evidence. The court will address each of these issues in turn.
1. The Commission’s finding of bias
The Commission held a full hearing on the defendant’s case. Its hearing examiner had the opportunity to evaluate the credibility of witnesses, including both the defendant and Greenstein. The officer specifically found the defendant to have a credible demeanor. AR Vol. 1, 303, 313. He noted her visible emotion when describing Greenstein’s statement that she was going to make sure the she didn’t get on the force. Id. at 300. By contrast, the examiner noted that Greenstein lacked any indignation at being accused of being biased and, in essence, sabotaging a woman’s career. Id. at 303. He also noted that Greenstein had testified that it was her practice to contemporaneously record all material details of her medical examinations because her memory is not very strong, and as such had testified, “I would have noted it if I felt that Ida was withholding documents or information.” Id. at 299. As such, he felt that the absence of any such notations in the defendant’s medical records was suspicious, especially since there is evidence that Greenstein spoke to both Hunt and Mullan at length about the defendant’s case. Id. at 303. The fact that Greenstein denied having any such conversation despite the testimony of her colleagues also countered against her credibility in the hearing examiner’s eyes. Id. at 318. He consequently concluded that Greenstein had indicated that she was going to attempt to block the defendant’s appointment, and then had omitted any mention of her purported suspicions regarding the defendant’s veracity from her notes in order to make it appear that the impetus for the decision originated primarily with Mullan and Hunt.
The Commission’s decision to believe the defendant and disbelieve Greenstein does not cite apparent motive for Greenstein’s animus toward the defendant. One well might interpret Greenstein’s statement that she would see to it that the defendant would not get on the force as a product of legitimate concern over discrepancies in the medical questionnaires rather than active animus. But for a determination to be based on substantial evidence, it suffices that it was based on “such evidence as a reasonable mind might accept as adequate . . .” G.L.c. 30A, §1(6). The Commission was best placed to evaluate the truth of the defendant’s allegations of Greenstein’s unprofessional behavior. Consequently, based on the record and the applicable law, the court finds that the evidence presented to the Commission was adequate to support its conclusion regarding bias.
The Commission’s finding that the defendant’s evaluation process was unfair is an important one, because confronting “political considerations, favoritism, and bias” is the core mission of the civil service law. Cambridge, 43 Mass.App. at 304. Consequently, a lesser degree of deference to the appointing authority is warranted. Cf. Beverly, 78 Mass.App. at 188 n.14 (“[T]his case [where bias was not an issue] does not raise the most significant concerns that the commission was created to address, and greater deference to the local appointing authority is warranted”).
*440 It is perhaps open to question whether the finding of Greenstein’s animus alone constituted sufficient grounds for the Commission’s decision to require the defendant’s name to be placed at the top of the current or next list. As BPD notes, see Plaintiffs Memo, 23, the decision to bypass the defendant was not ultimately Greenstein’s. Rather, the formal request for a bypass came from Roberta Hunt following round-table discussions in which Greenstein was not present. But the Commission found that both Mullan and Hunt had relied veiy heavily on Greenstein’s judgment in forming their own opinions. AR Vol. 1 at 325-26. See AR, Vol. 2, 147. (Mullan knew that Hunt would rely “really entirely” on information she and Greenstein provided in roundtable discussion.) It also determined that Mullan did not give the defendant any substantive opportunity to explain her actions and did not review the employment records she submitted to explain her injury. AR Vol. 1 at 305. In essence, then, the Commission found a direct causal link between its finding of Greenstein’s bias and BPD’s decision to request a bypass.
A finding of bad faith alone would likely be sufficient grounds to justify the Commission’s decision. See Mayor of Revere v. Civil Serv. Comm’n, 31 Mass.App.Ct. 315, 322-23 (1991). However, the Commission also found that BPD lacked reasonable justification for its actions because the defendant did not intend to deceive BPD through her submissions. The court will consider each of the three justifications for bypassing the plaintiff in turn.
A.Defendant’s purported rejection from the military
BPD implicitly accepts that ROTC is not strictly “the military” by explaining that the thrust of its argument is not the factual inaccuracy of the defendant’s answer per se but rather the discrepancy between the information provided during her 2004 medical evaluation and her 2006 questionnaire. See Plaintiffs Memo, 11.[6] Consequently, BPD contends that she subjectively believed ROTC was part of the military and lied in 2006 in an effort to bolster her candidacy for the physically demanding position of role officer. Thus, BPD believes that even if the defendant’s answer was factually correct, it was nevertheless motivated by dishonesty. But the defendant did not have a copy of her 2004 documents to refer to when filling out the questionnaire. AR, Vol. 1 at 310. Moreover, the Commission accepted the defendant’s testimony that she answered that she had not been disqualified from the military after she made calls specifically to verify that ROTC was not actually part of the military. Id. 311; AR Vol 3. at 67-68. This court will not disturb the Commission’s finding that the defendant did not lie regarding her military status.
B.Defendant’s failure to report her head injury
The court now turns to the defendant’s failure to report the 2003 head injury on her 2006 questionnaire. BPD does not address this issue in detail in its memorandum; rather, it concentrates on the argument that the Commission substituted its discretion for BPD’s in choosing to credit the defendant’s testimony that the omission was unintentional. But again, the Commission’s decision was premised on its differing findings of fact rather than differing judgment about what sort of response was proper based on the facts found.
The defendant’s explanation of her October 2003 injury reveals that she received three stitches and suffered temporary headaches after a vase fell on her head. AR Vol. 1, 97. It is undisputed that she failed to mention this incident in 2006, but the hearing examiner credited the defendant’s testimony that she simply hadn’t remembered it when filling out the questionnaire. Id. at 311. The injury was a minor one (as even BPD’s employees admitted, see id.) and it is perfectly plausible that the defendant would have a significantly better chance of remembering it in 2004 rather than 2006. The Commission’s decision on this point was premised on substantial evidence.
C.Defendant’s explanation of her back injury
The most strongly contested factual disagreement between the parties relates to the differing answers the defendant gave to BPD regarding her 2002 back injury in the 2004 and 2006 questionnaires. In both cases, the defendant checked a number of boxes relating to back injuries; the matter of dispute is whether the defendant’s answer explaining the injury was willfully misleading. Certainly, the answers do differ substantially, notably in the amount of time the defendant stayed out of work: in 2004, she said she was out of work for “3 or 4 months,” AR Vol. 1 at 97, whereas in 2006 she stated she missed one day of work and was advised of light duty. Id. at 110.
The Administrative Record reflects that the defendant lost her balance and almost fell down when moving a heavy piece of luggage on June 24, 2002, but managed to complete the day’s work. Id. at 139. The next day, however, she was unable to move. She took one day off from work, took her regularly scheduled days off, and then went on light duty until the beginning of August. ARVol. 3 at 87, 129, 137. During this time, she continued to be paid. ARVol. 1 at 197. The defendant testified that she later had to stop working because she had been prescribed Tylenol with codeine. AR Vol. 3 at 87. She viewed the period when she was on medication separately from the sick day she took off from work at the end of June. ARVol. 3 at 129. She was cleared for light duty again (but not for her regular work as a baggage handler) on December 14,2002. AR Vol. 1 at 152. However, there was no “light duty” work available. ARVol. 3 at 88. Consequently, the defendant took another job working at the Federal Court and began work in January or February 2003, ARVol. 3 at 27, and was informed she was no longer on the payroll *441 at her old job on February 24, 2003, per company policy. AR Vol. 1. at 204.
It would have obviously been preferable for the defendant to have explained all of this in detail on her questionnaire. Nevertheless, the Commission could well have determined that her 2006 answer was incomplete rather than truly inaccurate: she did indeed miss one day, initially, then went on light duty. It was only after working on light duty that she went out on disability due to taking the Tylenol with codeine. This omission does cast the defendant in a more favorable light from a hiring standpoint, since it tends to suggests that the defendant’s injury in 2002 was less severe than it really was. But again, the Commission credited the defendant’s explanation of her 2006 answer, specifically concluding, “I find [her] mistakes to be minor and not done intentionally.” Vol. 1. at 315.
There are a number of facts in the record that tend to corroborate the defendant’s account. While BPD insists that the defendant was dishonest because she omitted her extensive disability leave, the Commission found that the defendant was aware that BPD was in possession of her 2004 questionnaire. It would be counter-intuitive for the defendant to have engaged in deliberate omissions that she knew were easily discoverable through reference to written answers she had already made to the BPD just two years earlier. It also appears from the Administrative Record that the defendant did discuss suffering a back injury both during her psychological evaluation with Dr. Scott, see AR. Vol. 1 at 115, and during her health evaluation with Greenstein, whose notes mention that the defendant was “OOW [without] pay x 6 months; never returned to previous job.” Id. at 113. Finally, defendant’s 2006 questionnaire lists a host of “yes” answers to questions about back problems, including back injury, low back pain, lost time from work because of back injury, advised to have an operation, MRI of lumbar back for spondylolysis, and limitations on work due to back injury. It would have been counter-intuitive for defendant to engage in deliberate omissions when her “yes” answers were almost certain to cause close scrutiny of her medical history and the condition of her back. In view of these facts, and the hearing examiner’s opportunity to view the defendant’s demeanor on the stand, this court concludes that the Commission reasonably credited the defendant’s testimony.
2. Conclusion
The Commission’s determination that the defendant was truthful in her application to be a Boston police officer was supported by substantial evidence. This is not a case of the Commission’s substituting its discretion for the appointing authority’s. Contrast Boston Police Dept. v. Suppa, Civil Action No. 08-5237 (Mass.Super.Ct. January 4, 2010) (Hines, J.) (Commission was arbitrary and capricious in ruling in favor of police officer applicant who admitted to sufficient facts on an assault and battery with a dangerous weapon charge); Boston Police Dept. v. Rodrigues, Civil Action No. 08-3751 (Mass.Super.Ct. October 23, 2009) (Giles, J.) (Commission overstepped authority in ruling for applicant who had history of tardiness with civilian employer and had received four non-judicial punishments while in the Marine Corps). Rather, its decision to reinstate the defendant at the top of the next certification list was a product of its de novo determinations of her credibility and that she suffered from unwarranted bias in the hiring process. Since there was substantial evidence in the record to support the Commission’s findings, its decision will be upheld.
3. Commission’s authority to grant relief
The sole remaining issue to be resolved is whether the Commission overstepped its authority under G.L.c. 31, §2 in forbidding Greenstein from participation in further interviews of the defendant, using the reasons stated in its original bypass request for any future bypass of the defendant, and ordering that all further efforts to bypass her be supported by recordings of all proceedings regarding her candidacy.
The scope of the Commissions authority to grant relief is set forth in St. 1993, c. 310, §1, which provides that, “If the rights of any person acquired under the provisions of chapter thirty-one of the General Laws or under any rule made thereunder have been prejudiced through no fault of his own, the civil service commission may take such action as will restore or protect such rights . . .” This language nanrows “the issue before the Superior Court judge to whether the commission had acted arbitrarily and capriciously.” Thomas v. Civil Serv. Comm’n, 48 Mass.App.Ct. 446, 451 (2000). A body acts arbitrarily and capriciously when “it lacks any rational explanation that reasonable persons might support.” Id., citing Cambridge, 43 Mass.App. at 303.
BPD contends the relief the Commission has granted (except, it seems, with regard to its order to place the defendant at the top of the next list) interferes with the Boston Police Commissioner’s right to regulate the screening procedures for applicants. But none of the relief the Commission ordered substantively affects BPD’s screening procedures. It does not dispense with the requirement of a health evaluation, but rather simply forbids Nurse Greenstein from conducting that evaluation for this defendant. It does not interfere with the existing “roundtable” process for evaluating applicants and deciding whether a bypass is necessary, but rather requires that those meetings be recorded to facilitate the resolution of any future disputes regarding this defendant. And the Commission’s order that the BPD not use its reasons for its 2006 bypass of the defendant as the basis of any future bypass is just a restatement of the basic principle of res judicata. All of the relief ordered by the Commission is rationally related to its finding that the defendant’s application was prejudiced by undue bias.
*442 ORDER
The Boston Police Department’s Motion is DENIED and the defendants’ Motion is ALLOWED. Judgment will enter for the defendants.

hese are records voluntarily submitted by Candreva prior to the health exam, labeled Exhibits 14 through 17 at the Commission hearing. See AR Vol. 1 at 295.

A copy of the questionnaire shows that she originally checked the “yes” box, but then crossed out the ‘yes” and checked “no.”

It is unclear when exactly these discussions took place, except that they occurred after the medical examination but before April 27, 2006.

See Plaintiffs Memorandum, 25 (‘The Defendant was bypassed because she was untruthful during her medical evaluation process . . .”); AR Vol. 1 at 319 (Commission’s decision stating “It is well established that honesty and good character are essential qualifications for the position of police officer").

There was no question on the 2004 Questionnaire regarding ROTC; rather, BPD knew about the incident from interviews, both in 2004 and 2006. AR Vol. 1 at 91.