Kaplan, Mitchell H., J.
INTRODUCTION
The plaintiff, Boston Police Department (the Department), filed this action pursuant to G.L.c. 30A, §14 and G.L.c. 31, §44 to appeal from a decision of the defendant, Massachusetts Civil Service Commission (the Commission). The Department made a conditional offer of employment to defendant, David Chaves, for a position as a police officer, but following psychological screening informed him that he would not be appointed — a so-called psychological bypass. Chaves appealed this bypass to the Commission. Following an evidentiary hearing conducted by a Commissioner, the Commission voted three to two to allow Chaves’s appeal. The Commission directed the Department to place Chaves at the top of the eligibility list for appointment as a Police Officer, and ordered that, if he is again conditionally appointed, any psychological screening must be performed by professionals other than those that had previously screened him. The Department appealed the Commission’s decision in the present action. The case is now before the court on the Department’s motion, and Chaves’s cross motion, for judgment on the pleadings. For the reasons that follow, the Department’s motion is ALLOWED and Chaves’s motion is DENIED.
FACTS
In 2007, Chaves’s name appeared on a special certification for Spanish-speaking persons eligible for appointment to one of twenty positions as police officers in the Department. He submitted an application, references, and other required materials and passed a pre-employment background investigation. On February 15, 2008, the Department made a conditional offer of employment to Chaves, subject to his passing a medical examination, which includes psychological screening.
In 2004, the Human Resources Division of the Commonwealth (HRD) approved the Department’s plan for psychological screening of applicants for entry-level public safety positions, including police officers (the Plan). The Plan has three phases. Phase I requires the applicant to take two written screening tests: the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) and the Personality Assessment Inventory (PAI). In Phase II, the Department psychiatrist reviews the applicant’s medical history, background investigation, test results and other materials and interviews the applicant. If this process raises no suitability issues, the psychiatrist reports that to the Department. If the Department psychiatrist believes that there are issues requiring further review, she prepares a report outlining her specific concerns and screening continues to Phase III. In Phase III, a board certified psychiatrist reviews the testing results, second phase clinical interview results and conducts an in-depth interview with the applicant. This second-opinion psychiatrist makes the final recommendation to the Department as to the suitability of the applicant to be a police officer. If her recommendation is that psychological or behavioral issues exist that would interfere with the applicant’s performance of essential functions of the job, she prepares a comprehensive report of her findings.
The HRD has promulgated regulations that define the medical standards that an applicant for a position as police officer must meet. The regulations divide medical conditions into two categories: A and B. Category A medical conditions are defined as those that would preclude an individual from performing essential job functions or present a significant risk to the health and safety of that individual or others. Category B conditions are medical conditions that, based on severity and degree, “may or may not” result in the same limitations or risks. As to psychiatric conditions, Category B conditions include: “any other psychiatric *454 condition that results in an individual not being able to perform as a police officer.” That is the condition at issue in this case.
Chaves took the MMPI-2 and PAI in February 2008 and then was interviewed by Dr. Marcia Scott. Dr. Scott had screened Chaves previously in 2006. That screening was performed in connection with Chaves’s application for a position as a police dispatcher for the Department, a non-civil service position. In 2006, he took the same exams that he took in 2008. Based on Dr. Scott’s consideration of the 2006 test results and her interview of him, she recommended against his being hired for the dispatcher position.[1] In 2008, Dr. Scott reviewed the new 2008 exam results, conducted another interview, and then concluded that she had concerns about Chaves’s ability to perform as a police officer. She therefore prepared a report and passed Chaves on for Phase III review.
Dr. Julia Reade performed the second-level psychiatric review on March 10, 2008. She is board certified in general psychiatry and forensic psychiatry. She has a private practice and is a clinical instructor in psychiatry at Beth Israel Deaconess Medical Center. By 2008, she had been a consultant to the Department performing second-level psychiatric reviews for ten years. Dr. Reade reviewed Chaves’s psychological testing reports, the other materials from Chaves’s application and background investigation, and Dr. Scott’s report, which made reference to Chaves’s 2006 screening exams and interview. In her second-level opinion she commented on Chaves’s academic achievements, he had both a bachelor’s and master’s degree in criminal justice, and strong references. She, however, also noted that the 2008 MMPI-2 results disclosed extreme defensiveness and therefore produced what she referred to as an invalid result; the same was true for the PAI results. Dr. Reade’s opinion summarized her interview with Chaves, during which he was extremely anxious, rambled in his responses to her questions, and was difficult to follow. She concluded as follows: “Mr. Chaves appears to be an intelligent, hard-working man with a sincere interest in police work. The current testing indicates that he may be too defensive or rigid to acknowledge limitations or ask for help... In his interview with me, Mr. Chaves was more collected [than with Dr. Scott] but was still acutely anxious and unable to answer even simple questions clearly or directly. He also presented as a rigid, moralistic man who has difficulty acknowledging any limitations or seeing his part in a difficulty. These limitations, in my opinion, would interfere with Mr. Chaves ability to tolerate the stress of police work, to communicate clearly or to ask for help appropriately.”
Based on Dr. Reade’s opinion and report, the Department determined that it would not offer Chaves a position as a police officer. To be implemented, the Department’s decision not to hire Chaves had to be, and was, approved by HRD. Chaves timely appealed the Department’s decision to bypass him for psychiatric reasons to the Commission.
Commissioner Henderson acted as hearing officer at the evidentiary hearing before the Commission. Dr. Reade testified on behalf of the Department. Dr. James Beck (also board certified in psychiatry and forensic psychiatry) and Mark Schaffer, Ph.D. (a forensic psychologist) testified on behalf of Chaves, who also testified on his own behalf. Following the hearing, the hearing officer issued a decision in which he made extensive findings of fact and conclusions of law (the Decision). In his Decision, the Commissioner rejected Dr. Reade’s opinion in favor of those offered by Drs. Beck and Schaffer.[2] In summary, Doctors Beck and Schaffer opined that Dr. Reade placed too much emphasis on her interview with Chaves and the test results, which she did not apply in an appropriate manner, and not enough on Chaves’s work history. In particular, the hearing officer wrote (in bold type) that he credited Dr. Beck’s conclusion that:
[Drs. Scott and Reade] based their conclusions primarily on their interviews of the candidate, and in the case of Dr. Reade, secondarily on the results of his earlier 2006 MMPI-2 which were not invalid and taken in connection with his Boston Police Dispatcher application. Once again, we find the Boston psychiatrists rejecting a mem on basis of test and interview data alone. In this case, not only are they unsupported by evidence from life, but there is substantial evidence from life that this man has performed well in multiple job situations. Neither in my own interview, nor in his life history is there any evidence that would support the conclusion that this interview and this test are evidence for a condition that would be cause to reject this candidate.
(Decision at 19.)
The hearing officer concluded that “[t]he Department’s psychological bypass of the appellant lacked a sound and sufficient reason pursuant to M.G.L.c. 31, §1 where the Department Doctor’s own psychological testing methods were inaccurate.” (Decision at 46.) The Decision directed that Chaves’s name be placed at the top of the eligibility list for appointment to the position of police officer so that he would receive at least one opportunity for appointment, and, if he were appointed, he would be granted seniority as of the date he would have been appointed, if he had not been bypassed in 2008. Further, if the Department again caused Chaves to be subjected to psychological screening, the screening was to be performed by qualified professionals other than Drs. Reade and Scott. The full Commission voted three to two to accept Commissioner Henderson’s Decision.
DISCUSSION
In a recent decision the Appeals Court carefully explained the respective roles of the appointing authority, the Commission, and the court in considering civil service bypass decisions, in particular, those *455 relating to the appointment of police officers. See City of Beverly v. Civil Service Commission, 78 Mass.App.Ct. 182 (2010) (Beverly). As the standards described in Beverly will control this court’s consideration of the issues raised in the instant appeal, the court quotes them at length, omitting internal citations and quotation marks for simplicity.
We begin by addressing the respective roles of the appointing authority and the commission, and the appropriate standard of review to be employed by courts sitting in review of their decisions. All parties agree that the city could bypass [the applicant] if it had a “reasonable justification” to do so. Under established case law, the city bore the burden of establishing by a preponderance of the evidence that it had such a reason. This means that it needed to demonstrate that its decision was done upon adequate reasons sufficiently supported by credible evidence, when weighed by an unprejudiced mind, guided by common sense and by correct rules of law.
In its review, the commission is to find the facts afresh, and in doing so, the commission is not limited to examining the evidence that was before the appointing authority. The commission’s task, however, is not to be accomplished on a wholly blank slate. Its role is to decide whether there was reasonable justification for the action taken by the appointing authority in the circumstances found by the commission to have existed when the appointing authority made its decision. The commission’s role, while important, is relatively narrow in scope: reviewing the legitimacy and reasonableness of the appointing authority’s actions. Although it is plain that the finding of the facts is the province of the commission, not the appointing authority, the commission owes substantial deference to the appointing authority’s exercise of judgment in determining whether there was “reasonable justification” shown. Such deference is especially appropriate with respect to the hiring of police officers. In light of the high standards to which police officers appropriately are held, appointing authorities are given significant latitude in screening candidates,
A court reviewing a decision made by the commission is bound to accept the findings of fact of the commission’s hearing officer, if supported by substantial evidence. All parties have accepted the commission’s factual findings as far as they go, and we accept them as well. The open question on judicial review is whether, taking the facts as found, the action of the commission was legally tenable.
Id. at 187-88. As was the case in Beverly, in the instant matter, there is no suggestion that Chaves’s bypass “was a subterfuge designed to mask improper motives such as ‘political considerations, favoritism, and bias in government hiring and promotion.’ Massachusetts Assn. of Minority Law Enforcement Officers v. Abban, 434 Mass. at 259, citing Cambridge v. Civil Serv. Commn., 43 Mass.App.Ct. at 304.” Id. at n.14. In consequence, “the dispute is thus not whether the city relied on improper considerations, but whether the city put forward a sufficient quantum of evidence to substantiate its legitimate concerns.” Id. at 188.
Of course, setting out the standards for review is far easier than applying them to the difficult issues raised by this appeal. In its Decision, the Commission defined its job in this psychological bypass case as follows: “In psychological bypass appeal cases, the Commission does far more than simply look to make sure that impermissible reasons are not being asserted, rather, it will require an Appointing Authority to show that its doctors’ psychological screening methodology is accurate and defensible.” (Decision at 43.) In further support of its view of its role, it states the undeniable tenet of law concerning expert testimony that “when the fact-finder is presented with conflicting expert evidence, the fact-finder may accept or reject all or parts of the opinions offered.” (Decision at 26.) There is no question that in appropriate circumstances, the fact-finder is free to do that. The question raised in this case is what are the facts that the fact-finder, i.e., the hearing officer, is directed to find in this bypass appeal. In particular, is it the function of the Commission to determine whether the psychiatrist’s opinion concerning Chaves was “accurate”?
As noted above, Beverly instructs that: “[The commission’s] role is to decide whether there was reasonable justification for the action taken by the appointing authority in the circumstances found by the commission to have existed when the appointing authority made its decision. The commission’s role, while important, is relatively narrow in scope: reviewing the legitimacy and reasonableness of the appointing authority’s actions. Although it is plain that the finding of the facts is the province of the commission, not the appointing authority, the commission owes substantial deference to the appointing authority’s exercise of judgment in determining whether there was ‘reasonable justification’ shown.” 78 Mass.App.Ct. at 187-88. The Commission’s job is therefore not the same as that of a “fact-finder” in a medical malpractice case, where two expert physicians offer competing opinions about a diagnosis and the fact-finder must decide which doctor he believes, in whole or in part. Here, it is undisputed that the Department bypassed Chaves based upon the opinion provided it by its consulting psychiatrist, Dr. Reade. The Commission’s role is therefore limited to deciding whether the Department was reasonably justified in relying on Dr. Reade’s opinion. In this court’s view, the Commission goes beyond its “relatively narrow” role in the appointment process, when the Commission decides that the opinions of the doctors testifying on behalf of Chaves at the hearing are more compelling than Dr. Reade’s and therefore concludes that the Department *456 has not proved reasonable justification for its bypass decision. The Commission may not substitute its judgment for the Department’s. See Cambridge v. Civil Service Comma. 43 Mass.App.Ct. 300, 304 (1997) (“It is not within the authority of the commission, however, to substitute its judgment about a valid exercise of discretion based on merit or policy considerations by an appointing authority ... In the task of selecting public employees of skill and integrity, appointing authorities are invested with broad discretion”). The court concludes that the Commission has done that in this case.
The Commission held that Chaves’s test results on the diagnostic tests that he took and Dr. Reade’s impressions based on her interview of Chaves were not scientifically reliable evidence on which Dr. Reade could base her opinion. The Commission adopted Dr. Beck’s definition of the term “other psychiatric condition that results in an individual not being able to perform as a police officer,” one of the Category B conditions that may disqualify an applicant. According to Dr. Beck, such a psychiatric condition “mean[s] evidence of some aspect of a person’s behavior or trait that appears over a range of circumstances or in a variety of situations, either in the historical past and/or the historical present.” According to the Commission, a psychiatrist can only conclude that the applicant suffers from such a condition where there is evidence that this condition has manifested itself in previous work experiences, and there was no such evidence in this case. Stated differently, and using the Commission’s own description of its role, Dr. Reade used the wrong “methodology” to reach her opinion and her opinion was not “accurate.”
In the court’s view, while it is certainly possible that Dr. Beck’s views are better researched or reasoned than Dr. Reade’s, what the Commission has done is not to find facts, but rather to substitute its judgment for that of the Department. It has adopted its own definition for Category B “psychiatric conditions” that will disqualify a candidate for the position of police officer and the quantum of proof that can establish that condition. It then determined that Dr. Reade’s opinion was not based on that definition and type of proof. This is not a case in which there was evidence that Dr. Reade was not qualified to render psychiatric evaluations of candidates, that she relied on “facts” that the Commission found to be false after an eviden-tiary hearing, or that Dr. Reade or the Department did not follow the psychological screening plan approved by HRD. Rather, in the Commission’s view, Dr. Reade did a poor job in rendering her medical judgment, relying too heavily on tests and her impressions from the interview and not enough on Chaves’s previous job performance as reported by his references.[3]
If the Commission’s role includes deciding whether Dr. Reade did a poor job in reaching her conclusion regarding Chaves’s psychiatric condition, then this court clearly would have no basis for overturning its Decision allowing Chaves’s appeal. The determination of whether to reject Dr. Reade’s opinion in favor of those to which Drs. Beck and Schaffer testified would then be part of the Commission’s fact finding mission and could be reversed only if unsupported by substantial evidence, which is certainly not the case here. However, the court finds that Commission’s role did not include analyzing Dr. Reade’s opinion to decide whether her conclusion was based on a methodology that the Commission deemed medically appropriate and her conclusion accurate under the Commission’s standards.
ORDER
For the foregoing reasons, the Department’s motion for judgment on the pleadings is ALLOWED and Chaves’s cross motion is DENIED. Judgment shall enter vacating the Commission’s Decision.

It appears that there was no second opinion review required for this position.

It appears that there have been a number of appeals from the Department’s decision to bypass a candidate for the position of police officer based on Dr. Reade’s second opinion psychiatric review. The court has been directed to approximately half a dozen appeals in which Dr. Reade testified for the Department in support of her opinion and Dr. Beck or Dr. Schaffer, or both of them, testified on behalf of the appellant. It appears that in each of these cases, the hearing officer rejected Dr. Reade’s opinion and accepted that of Dr. Beck and/or Dr. Schaffer, and the Commission voted three to two to accept the hearing officer’s conclusions.

Two points raised by Chaves do not alter this court’s opinion. First, the Commission noted that Dr. Reade stated in her report that “[Chaves] was a small man who appeared meek and had an ingratiating manner. His palm was sweaty when he shook my hand.” The Commission concluded that this comment established that Dr. Reade had a “prejudice and predisposition” adverse to Chaves. (Decision at 18.) Chaves argues that Dr. Reade was therefore ’biased." “Bias” and “prejudice” are loaded words generally used to suggest a preconceived and negative view of a group of which an individual is a member. See, e.g., Lipchitz v. Raytheon Company, 434 Mass. 493, 504 n.16 (2001). At the conclusion of the interview, when she prepared her report, Dr. Reade was biased against Chaves in the sense that she had concluded that he had a psychiatric condition that called into question his ability to perform as a police officer. The use of the words bias and prejudice, where there is no evidence that Chaves belongs to a class of individuals against whom Dr. Reade held a negative predisposition, does not affect the court’s analysis.
Second, the Commission contends that it was a violation of HRD’s policies or regulations for Drs. Scott or Reade to review or rely upon the results of the diagnostic tests that Chaves took in 2006. (“Prior testing, which [Chaves] approached in a less-guarded fashion, raised concerns about significant turmoil, anxiety and problems managing anger.”) According to the Commission, consideration of these 2006 test results, was, in itself, reason to allow Chaves’s appeal. (Decision at 33.) A review of HRD’s regulations cited by the Commission discloses no such limitation. Where the question before the psychiatrists is whether an applicant’s psychological condition renders him questionable for the position of police officer, it would seem that all relevant materials should be considered. Unless there was some reason why the prior diagnostic test results were untrustworthy, why wouldn’t they be relevant and probative in assessing psychological condition?