YOLANDA CLAUDIO *vs.* CITY OF CHICOPEE.

No. 10-P-1409.

Hampden. December 7, 2011. - April 5, 2012.

Present: KANTROWITZ, RUBIN, & AGNES, JJ.

*Civil Rights,* Availability of remedy. *Municipal Corporations,* Police, Officers and employees. *Police Officer. Public Employment,* Misconduct. *Practice, Civil,* Civil rights, Directed verdict.

Discussion of the standard of review applicable to the grant of a motion for a directed verdict in a civil action. [546]

In a civil action arising from the sexual abuse of the plaintiff by a police officer employed by the defendant city, the judge properly granted summary judgment in favor of the city on the plaintiff's claim against it for violation of 42 U.S.C. § 1983, where, although the plaintiff introduced evidence sufficient for a reasonable jury to find that the city failed specifically to train the officer not to engage in sexual misconduct or harassment of members of the public, the plaintiff failed to introduce sufficient evidence for such a jury to find that the city's failure to train amounted to deliberate indifference to the public's right to be free from sexual misconduct and harassment by the police [547-551]; and where the plaintiff failed to show that the city's failure to train the officer was the cause of the deprivation of her rights [551].

CIVIL ACTION commenced in the Superior Court Department on July 17, 2008.

The case was tried before *Cornelius J. Moriarty, II,* J.

*Tani E. Sapirstein* for the plaintiff.

*Edward J. Partyka* for the defendant.

AGNES, J. This case arises from the sexual abuse of the plaintiff, Yolanda Claudio, by Joshua Mozeleski, a former police officer for the city of Chicopee (city). After a jury trial, Mozeleski was found liable to Claudio for his tortious conduct, which is described in more detail below.[1] However, the trial judge

---

[1]Mozeleski did not appeal from the judgment entered against him on the jury verdict, and the only issue on appeal involves Claudio's claims against the city.

allowed a directed verdict in favor of the city as to Claudio's 42 U.S.C. § 1983 (2006) claim. Claudio now appeals, arguing that the judge incorrectly applied the standard for municipal liability enunciated in *Canton* v. *Harris*, 489 U.S. 378, 388-392 (1989) (*Canton*). We affirm.

*Factual background.* On the night of November 9, 2007, Claudio was acting as the designated driver during celebrations for her cousin's birthday. After she dropped her cousin off at the end of the night, she noticed Mozeleski, whom she did not know, in a nearby parked police cruiser. Mozeleski subsequently drove off and Claudio left a short time later. Mozeleski circled around and followed Claudio's car, eventually pulling her over without justification. Mozeleski, who was in uniform, checked Claudio's license and told her that it had been suspended for failure to pay a citation. He informed Claudio that he was supposed to arrest her for driving with a suspended license but that she was "too cute" for him to do so. He suggested that he would not arrest Claudio if she had sex with him. After Claudio rebuffed his advances, Mozeleski stated again that she was "too cute" and "innocent" to arrest. He obtained her telephone number by insisting that he needed it to make sure she got home safely. Mozeleski then kissed Claudio's lips and touched her upper arm without her consent. Afterward, Claudio drove home where she received a call from Mozeleski in which he asked whether he had detected lip gloss on her lips. He also told Claudio that she owed him a big favor. Mozeleski left a voicemail message on Claudio's answering machine three days later; the record does not reveal the content of that message.

Claudio filed a complaint against Mozeleski with the city's police department on November 13, 2007. The department promptly began an investigation into Mozeleski's conduct. This investigation included a conversation between the investigating officer and Claudio in which Claudio played him Mozeleski's voicemail message. The investigating officer also sent several written inquiries to Mozeleski, to which Mozeleski replied in writing. Mozeleski remained on street duty during the investigation,[2] but on January 5, 2008, three days after the investigation concluded, he was removed from such duty.

---

[2]Testimony at trial indicated that the city's police officers have the right to

As a result of the investigation, the city's police chief suspended Mozeleski for five days, the maximum discipline that a police chief may impose under civil service laws. While none of the grounds for discipline used the term sexual abuse, the police chief testified at trial that Mozeleski's conduct fell within the regulations regarding incompetence and courtesy. The police chief also referred the matter to the mayor of the city, who held a hearing and exercised his authority to terminate Mozeleski's employment with the city.

At the time of the incident in question, the city did not have any policies specifically prohibiting police officers from engaging in sexual misconduct toward or sexual harassment of members of the public, nor did they institute such policies after the incident.[3] The city did have policies regarding sexual harassment in the workplace, which every city police officer was required to sign, including Mozeleski. The city's police officers also receive training relating to sexual harassment at the police academy. The city does not maintain its own training program regarding sexual misconduct or harassment of members of the public by police officers. Nonetheless, there was only one complaint of sexual misconduct or harassment of a member of the public by a city police officer in the thirty-two years prior to this incident. That complaint was in the late 1980s, did not involve Mozeleski, and was ultimately not supported.

*Discussion.* 1. *Standard of review.* We review the grant of a motion for a directed verdict to determine whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Dobos* v. *Driscoll,* 404 Mass. 634, 656, cert. denied sub nom. *Kehoe* v. *Dobos,* 493 U.S. 850 (1989), quoting from *Poirier* v. *Plymouth,* 374 Mass. 206, 212 (1978).

---

an investigation before being reassigned, though the testimony did not indicate the source of this right.

[3]The police chief testified that the reason the department did not have a specific rule or regulation prohibiting officers from asking for sexual favors while on duty is that such conduct is contrary to common sense, common decency, and the "proper standards of conduct for any human being much less a police officer." He also testified that such conduct would violate the regulations regarding incompetence and courtesy.

2. *Municipal liability.* Claudio alleges that, under 42 U.S.C. § 1983, the city is liable for Mozeleski's actions because its failure to train Mozeleski regarding sexual misconduct and harassment of members of the public amounted to deliberate indifference to the rights of persons with whom he came in contact.[4] "[L]ike supervisory liability, municipal liability is not vicarious. Municipalities can be held liable only if municipal employees commit unconstitutional acts and those actions are shown to have been caused by a 'policy or custom' of the government." *Estate of Bennett* v. *Wainwright,* 548 F.3d 155, 177 (1st Cir. 2008), overruled on other grounds, *Maldonado* v. *Fontanes,* 568 F.3d 263 (1st Cir. 2009). "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton,* 489 U.S. at 388. "This rule is most consistent with our admonition . . . that a municipality can be liable under § 1983 only where its policies are the moving force [behind] the constitutional violation." *Id.* at 388-389 (citations and quotation omitted). To satisfy this standard, a plaintiff must show that (1) a policy[5] or custom[6] existed that was attributable to the municipality; and (2) the custom was the cause of the deprivation of the plaintiff's constitutional rights. See *Bordanaro* v. *McLeod,* 871 F.2d 1151, 1156 (1st Cir.), cert. denied sub nom. *Everett* v. *Bordanaro,* 493 U.S. 820 (1989) (city was liable to plaintiff because there was longstanding and widespread practice of breaking down doors without warrant when arresting felons, which was followed by police in this case and directly led to

[4]Claudio does not appear to have made any argument or presented any evidence that the city had any affirmative policy or custom of encouraging or permitting sexual misconduct or harassment of members of the public.

[5]A policy is a statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers, final policy making authority, or an official to whom the lawmakers have delegated policy making authority. *Pembaur* v. *Cincinnati,* 475 U.S. 469, 479-483 (1986).

[6]A custom is a persistent and widespread practice that is not authorized by written law but is "so permanent and well settled as to . . . [have] the force of law." *Monell* v. *Department of Social Servs. of the City of N.Y.,* 436 U.S. 658, 691 (1978), quoting from *Adickes* v. *S.H. Kress & Co.,* 398 U.S. 144, 167-168 (1970).

injuries in question).[7] A municipality's failure to train an employee can only qualify as such a policy or custom when the failure to train amounts to deliberate indifference to the rights of its inhabitants. See *Canton*, 489 U.S. at 388-389; *Tambolleo* v. *West Boylston*, 34 Mass. App. Ct. 526, 531 (1993) (*Tambolleo*).

At trial, Claudio introduced evidence sufficient for a reasonable jury to find that the city failed to specifically train Mozeleski not to engage in sexual misconduct or harassment of members of the public.[8] However, Claudio has failed to introduce sufficient evidence for a reasonable jury to find that the city's failure to train amounted to deliberate indifference to the public's right to be free from sexual misconduct and harassment by the police.

a. *Deliberate indifference.* Claudio relies on several facts in her attempt to show that the city's failure to train Mozeleski amounted to deliberate indifference to the constitutional rights of the public. First, she argues that the city should have known, based on common sense, that there was a substantial risk that its police officers would engage in sexual misconduct of members of the public. Second, Claudio argues that the existence of a prior complaint regarding the sexual misconduct or harassment of the public by a police officer alerted the city to the need for training regarding sexual misconduct toward the public. Finally, Claudio argues that the city's actions following her sexual abuse at the hands of Mozeleski support the conclusion that deliberate indifference lies at the heart of its failure to train.

Under established law, the facts of this case do not rise to the level of deliberate indifference. In *Tambolleo*, 34 Mass. App. Ct. at 527, we determined the defendant town was not liable for a police officer's assault and battery of a member of the public.[9] The police officer in *Tambolleo* beat one of the plaintiffs with

---

[7] See also *County Commrs. of Bryan County* v. *Brown*, 520 U.S. 397, 404 (1997) (plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged" [emphasis in original]); *Tambolleo* v. *West Boylston*, 34 Mass. App. Ct. 526, 528 (1993).

[8] In light of the outcome of this case on the other elements of municipal liability, we need not address whether a reasonable juror could find that the city's officers received in the police academy training regarding sexual misconduct and harassment of members of the public.

[9] *Tambolleo, supra,* was an appeal from a grant of summary judgment for the municipal defendant, in which the Superior Court judge assumed that the plaintiffs' allegations were true for the purposes of deciding that motion.

his fists and flashlight; when the other plaintiff attempted to intervene, the officer grabbed that plaintiff and threatened to arrest her. *Id.* at 527-528. The police officer had a previous complaint against him concerning his belligerent behavior and combative attitude during the stop of a civilian for speeding. *Id.* at 529. When the officer's superiors became aware that the officer had physically attacked the plaintiffs, they did not implement any discipline against him, other than telling him to give "deep thought" as to why he had more civilian complaints than other officers. *Ibid.* We concluded that, even assuming the officer's training had been inadequate, the prior complaint against the officer did not support a finding that the town "encouraged, condoned, or acquiesced in violations of citizens' constitutional rights." *Id.* at 531. We also concluded that the town's actions in response to the officer's misconduct were not alone sufficient to find municipal liability. *Ibid.*, citing *Santiago* v. *Fenton*, 891 F.2d 373, 382 (1st Cir. 1989).

The risk that a police officer would engage in sexual abuse of a member of the public and attempt to extort sexual favors is not more obvious than the risk that a police officer would assault and batter a member of the public and threaten to arrest the sole observer of the incident. Neither, standing alone, can form the basis for finding a municipality to be deliberately indifferent to the rights of the public for failing to train its officers against the relevant risk. When "misdeeds relate to such basic norms of human conduct[,] . . . in the ordinary case a municipal policymaker need not expend precious resources on training or supervision but can instead rely on the common sense of her employees." *Walker* v. *New York*, 974 F.2d 293, 301 (2d Cir. 1992), cert. denied, 507 U.S. 961 and 507 U.S. 972 (1993).

In addition, both *Tambolleo* and the present case featured an allegation that the municipality should have been aware of a substantial risk due to one prior incident in which a civilian had complained of somewhat similar behavior. In that respect, this case is weaker than *Tambolleo*, where the prior complaint was a recent one against the same police officer. Here, there had been no previous complaints regarding sexual misconduct or harassment by Mozeleski. In fact, there had only been one complaint regarding any form of sexual misconduct by a member of the

city's police force in the last thirty-two years. That complaint occurred in the 1980s and the officer was cleared of the charge. The city's failure to implement training regarding sexual misconduct or harassment of the public based on the incident did not amount to deliberate indifference. See *Cuddy* v. *Boston*, 765 F. Supp. 775, 778 (D. Mass. 1991) (single alleged incident of individual misconduct does not support inference that city failed to train officers); *Noel* v. *Plymouth*, 895 F. Supp. 346, 351 (D. Mass. 1995) (three past incidents of police brutality "plainly inadequate" to create deliberate indifference); *McElroy* v. *Lowell*, 741 F. Supp. 2d 349, 354 (D. Mass. 2010) ("a single instance of police misconduct in the field, standing alone, is insufficient to establish the endorsement of an informal policy or custom by the City").

Finally, the city here took far stronger corrective action than the municipality in *Tambolleo* in response to the officer's misconduct. The city acted promptly and conducted a thorough investigation of Mozeleski's misconduct.[10] When the police chief determined that Mozeleski had taken the actions of which

[10]In light of the evidence that the city's police officers enjoyed a contractual right to an investigation prior to reassignment, see note 2, *supra*, and the absence of any evidence of prior unlawful action by Mozeleski that reflected an attitude by the city of deliberate indifference to sexual misconduct and harassment, the city's approach to Mozeleski's unlawful conduct was not actionable under *Tambolleo*. However, in other circumstances where there is some history of indifference to such incidents, the failure to reassign or to take some other immediate action against the officer may fall outside of *Tambolleo's* protective ambit.

The Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA), is an independent accrediting authority created in 1979 by the four major law enforcement executive associations: International Association of Chiefs of Police; National Organization of Black Law Enforcement Executives; National Sheriffs' Association; and Police Executive Research Forum. CALEA was established, in part, to develop a set of law enforcement standards and to establish and administer an accreditation process through which law enforcement agencies could demonstrate voluntarily that they meet professionally recognized criteria for excellence in management and service delivery. See http://www.calea.org/content/commission (last viewed April 3, 2012). In late 1983, CALEA issued a manual of standards and invited local and State police agencies to begin the process of demonstrating that they were able to meet those standards. Since 2004, the CALEA standards include a mandatory requirement, as a condition of professional accreditation, that police departments establish an "Early Intervention System" to better enable management to identify officers who appear to have recurring performance problems. See

Claudio accused him, he imposed the maximum sanction that he was legally allowed to impose, a five-day suspension. The matter was then referred to the mayor, who was lawfully entitled to fire police officers. After a hearing on Claudio's accusation, the mayor terminated Mozeleski's employment with the city. This remedial action was much stronger than the ambiguous warning given to the officer in *Tambolleo* and, in light of that case, does not show deliberate indifference to the rights of the public.[11]

b. *Causation.* On the specific facts of this case, Claudio also has not shown that the city's failure to train Mozeleski was the cause of the deprivation of her rights. Claudio's contention that this doctrine creates the "perverse" result of making a municipality less likely to be liable where an employee's behavior is more egregious misses the point of *Monell* v. *Department of Social Servs. of the City of N.Y.*, 436 U.S. 658 (1978). Under *Monell*, the relevant question is not how egregious a municipal employee's behavior is, but rather whether the municipality itself acted in an unlawful way by permitting or encouraging that behavior. See *id.* at 694-695. "[M]unicipal policymakers may appropriately concentrate training and supervision resources on those situations where employee misconduct is likely to deprive citizens of constitutional rights." *Walker* v. *New York*, 974 F.2d at 298.[12]

*Conclusion.* The outcome we reach does not mean that a civilian subjected to sexual abuse of this type could never succeed in holding a municipality liable under 42 U.S.C. § 1983. "Few institutions depend as heavily on integrity and credibility

Pierce, Best Practice Management and CALEA: Implications for Law Enforcement at 7-8 (2012), found at http://www.calea.org/sites/default/files/ Best%20Practice%20Management.pdf (last viewed April 3, 2012).

[11]It is ultimately without significance that Mozeleski was disciplined, then discharged, for violation of the rules regarding courtesy to the public and incompetence, rather than sexual abuse. The police chief testified that these rules covered Mozeleski's sexual abuse of Claudio and we do not think a reasonable jury could find otherwise. Given the strength of the city's response, we also find the city's failure to implement new policies regarding sexual misconduct or harassment of the public to be without significance.

[12]Claudio's allegation that the city had inadequate policies to prevent sexual misconduct toward members of the public is somewhat factually distinct from her failure-to-train claim, but is analytically identical. For the reasons stated above, this claim is also without merit.

for the effective performance of their duties as do police departments." *Local 346, Intl. Bhd. of Police Officers* v. *Labor Relations Commn.*, 391 Mass. 429, 439 (1984). "[P]olice officers voluntarily undertake to adhere to a higher standard of conduct than that imposed on ordinary citizens." *Attorney Gen.* v. *McHatton*, 428 Mass. 790, 793 (1999). "The position of a police officer is one of special public trust. Police officers must comport themselves in accordance with the laws that they are sworn to enforce and behave in a manner that brings honor and respect for rather than public distrust of law enforcement personnel." *Beverly* v. *Civil Service Commn.*, 78 Mass. App. Ct. 182, 188 n.12 (2010) (quotations and citations omitted). A police officer's extortionate demand for sexual favors in return for declining to arrest, ticket, or charge a civilian is a grave abuse of power.[13]

The jury appropriately found Mozeleski liable to Claudio for a violation of Claudio's constitutional rights under § 1983, and for intentional infliction of emotional distress; the question of municipal liability under § 1983 in this case is controlled by *Tambolleo*. However, Claudio failed to offer evidence that her injuries were the result of an officially sanctioned policy of, or widespread practice in, the city's police department[14] that the city officials were aware of and failed to curb. She also failed to offer evidence that any such policy or practice caused her injuries. Accordingly, the judge was correct in directing a verdict in favor of the municipality.[15]

*Judgment on directed verdict
affirmed.*

---

[13]"To that end, it is extremely important for the police to gain and preserve the public trust, maintain public confidence in the integrity of police officers, and avoid an abuse of power by law enforcement officials. In the context of this case, motorists, while anticipating the possibility of being stopped by the police for a traffic violation, trust that they will not then be subjected to extreme abuse and humiliation." *Clancy* v. *McCabe*, 441 Mass. 311, 328 (2004) (Ireland, J., dissenting).

[14]There was no evidence offered by Claudio of a widespread practice of sexual misconduct and harassment of females by police officers outside of the Chicopee police department (whether in western Massachusetts or elsewhere), and thus we need not consider the potential impact of such evidence.

[15]It would be a mistake to infer from the result we reach that a police department or municipality should not adopt policies or implement training

Claudio *v*. City of Chicopee.

programs to prevent sexual abuse and sexual misconduct by police officers in the course of their official duties. Police academy training, in-service training, and the enforcement of comprehensive policies and procedures designed to regulate the exercise of discretion by police officers is essential to ensure that police officers meet the very high standards of behavior that society expects them to follow. See Mastrofski, Police Agency Accreditation: The Prospects of Reform, 5 Am. J. Police 45, 45 (1986) ("Establishing standards of agency performance has long been an object of reformers wanting to professionalize American law enforcement . . .").

We take notice of the fact that many Massachusetts police departments have been accredited by CALEA or are in the process of obtaining accreditation, and have adopted comprehensive policies, procedures, rules, and regulations to promote the highest standards of professionalism by their officers. See note 10, *supra*. In some cases, police departments have posted their policies and procedures online. For example, the city of Boston has posted many of its police department's rules and regulations on the city's official web site, see http://www.cityofboston.gov/police/rules.asp (last viewed April 3, 2012), and has adopted a "Public Integrity Policy," which includes a detailed set of ethical norms for its police officers. Boston Police Department Rules and Procedures Rule 113, § 5 (1995).

The adoption and enforcement of a comprehensive set of policies and procedures, including a specific code of ethical conduct, like that adopted by the city of Boston and many other Massachusetts communities, is in keeping with the modern trend in police management. See, e.g., International Assn. of Chiefs of Police, Model Policy on Standards of Conduct (Oct. 1998), found at http://www.theiacp.org/PoliceServices/ProfessionalAssistance/Ethics/ModelPolicyonStandardsofConduct/tabid/196/Default.aspx (last viewed April 3, 2012).