Wilson, Paul D., J.
This case stems from a decade-long dispute between Scotty Thyng, the plaintiff, and various members of the City of Quincy’s municipal government, including the Conservation Commission (“ConComm”). Thyng’s seemingly mundane request to build a house on a vacant parcel of land he owns in Quincy has devolved into the present lawsuit in which Thyng claims that he is entitled to damages for civil rights violations committed by the various defendants. According to Thyng, this case asks a simple question: Can the defendants be held liable for interfering with Thyng’s right to use and enjoy his property, for an improper private motive of one of them, through their conduct in stonewalling and obfuscating a straightforward permitting process into a decade-long ordeal?
Even if the factual and procedural histoiy of this case is complicated, the three claims asserted in Thyng’s Complaint are relatively straightforward. Thyng has asserted claims under: 42 U.S.C. §1983, the federal civil rights statute; G.L.c. 93, §102, the Massachusetts Equal Rights Act; and G.L.c. 12, §§11H, 111, the Massachusetts Civil Rights Act. The defendants have requested summary judgment as to each claim, asserting myriad defenses, including that the claims are barred by the statute of limitations, that various defendants cannot be sued under section 1983, that the Massachusetts Equal Rights Act does not apply to this case, and that Thyng cannot prevail under the Massachusetts Civil Rights Act because the record does not reflect the defendants’ use of threats, intimidation or coercion.
As discussed below, Thyng’s claim under G.L.c. 93, §102 fails as a matter of law. Likewise, municipalities and individuals sued in their official capacities cannot be held liable for civil rights violations absent special circumstances, none of which are present here, *216 thereby requiring the claims against the City of Quincy, the Quincy ConComm and the individuals sued in their official capacities to be dismissed. The rest of the claims present factual questions that must be resolved by the trier of fact. Accordingly, summary judgment is ALLOWED in part and DENIED in part.
BACKGROUND
The summary judgment record, viewed in the light most favorable to Thyng as the non-moving party, reflects the following.
Thyng has sued the City of Quincy, which is a municipal corporation, along with the ConComm and all of its board members in their individual and official capacities. Claims are also laid out against Robert J. Quinn, the Assistant City Solicitor; Heather Sargent, the ConComm’s administrator and enforcement officer; and Joseph Duca and Robert Conlon, who worked in the City’s Building Department. Finally, Thyng asserts claims against the former Mayor of Quincy, Francis X. McCauley, a neighbor to the property at the center of this dispute who, according to Thyng, orchestrated the pattern of interference and delay because McCauley did not want another house built in his neighborhood.
Thyng owns a parcel of land located at 202 Manet Avenue in Quincy, Massachusetts (the “Property”). He purchased the Properly, which was then a vacant lot, and the parcel next to it (198 Manet Avenue), which contained a small cottage, in 1981. Both parcels extend from Manet Avenue down to Quincy Bay, and a seawall crosses both properties approximately 100 feet from the street. Defendant McCauley is an abutter to the Property. McCauley served on Quincy’s City Council during a portion of the relevant time period, and he has also served as Mayor of the City of Quincy. McCauley lives approximately 50 feet from the Property but has testified that he would not be able to see any new structure built on the Property.
When Thyng purchased the Property in 1981, the building inspector informed him that the Properly never had a structure on it and was a buildable lot. On the lot adjoining the Property, Thyng, over the course of several years, expanded the small cottage by doubling the foundation size and adding two floors. Thyng and his wife resided in that cottage at 198 Manet Avenue from 1981 until 1998, when they sold that property. Thyng maintained ownership of the Property after the sale of 198 Manet Avenue.
Soon after the sale of 198 Manet Avenue, Thyng began trying to sell the Property as a buildable lot. In September 2000, Thyng reached an agreement to sell the Property to a potential buyer. Despite a 1997 decision from the Quincy Zoning Board of Appeals (“ZBA”) that found that the Property was a buildable lot, Heather Sargent, the Quincy ConComm’s administrator and enforcement officer, or Devon Marinelli of the Quincy ZBA, told the prospective buyers’ broker that the Property was unbuildable. Walter White, then director of Quincy’s Zoning Inspectional Services Department, issued a letter to the broker expressing a contrary viewpoint: that the Property was a buildable lot.
In October of2000, the prospective buyers, with the assistance of Sargent, filed a Request for Determination of Applicability (“RDA”) asking the ConComm to determine if state and local wetlands regulations applied to the house they intended to construct on the Property. After the ConComm held a hearing on the RDA, the ConComm ruled that the buyers would need to file a Notice of Intent (“NOI”) and go through the wetlands permitting process if they wanted to build on the Properly. Thyng did not receive any notification of the RDA, and was left out of the ConComm hearing process entirely. Based upon the ConComm’s RDA determination, the buyers demanded their deposit back and cancelled the agreement.
Over the course of the next decade, Thyng encountered numerous obstacles in his efforts to build on the Property. After the buyers backed out of the purchase of the Properly, Thyng approached Sargent about the ConComm’s RDA determination, and she told him that the Property was unbuildable and that he should donate it to the city and take the tax write off. In February of 2003, Thyng submitted a new RDA to the ConComm, but the ConComm never scheduled a hearing on the matter. Later that year, Thyng attempted to file an NOI concerning the construction of a single-family home on the Property with the ConComm but Sargent refused to accept it. Thyng therefore filed the NOI directly with the Massachusetts Department of Environmental Protection (“DEP”) and sent a copy to the ConComm. This tactic appeared to spur the Con-Comm into action, and eventually it scheduled a hearing on Thyng’s application. However, when Sargent found out that Thyng had attempted to circumvent her and the ConComm, she told Thyng’s attorney, Paul Hines, “I’ll get him [Thyng] for this.” In another incident, Sargent asked Hines “Why are you working for that asshole?”
After numerous delays, the ConComm hearing on Thyng’s NOI was held on June 16, 2004. At the close of the hearing, the ConComm voted to deny the permit application, under both the state Wetlands Protection Act and Quincy’s local wetlands ordinance, for lack of information. However, the ConComm later issued a written decision that contained conditions and findings that were not discussed at the hearing which, in essence, prevented Thyng from being able to re-file with the additional information right away. The minutes from the June 16 hearing were never released, contrary to the ConComm’s usual practice.
Thyng appealed the state law aspects of ConComm’s denial to the DEP. The DEP eventually issued a Superseding Order of Conditions on February 4, 2005 that reversed the ConComm’s decision and allowed Thyng’s project as it had been proposed. In a *217 parallel action, Thyng also appealed the ConComm’s decision to this court under Quincy’s local wetlands ordinance. Thyng’s attorney and Quinn, the city solicitor that was acting on behalf of Quincy’s ConComm, reported that case as settled at a 2006 status conference. This Court then entered a judgment remanding the case to the ConComm.
Despite the remand from this court and the DEP’s determination in Thyng’s favor, the ConComm refused to schedule a new hearing for Thyng’s permit application. Sargent refused to schedule the hearing “because [Thyng] is suingme,”[2] she told Thyng’s attorney Hines. She referred Hines to Quinn in the City’s Law Department, but Quinn did not take any affirmative steps to schedule a hearing either. William Keener, who was deposed as the ConComm’s Rule 30(b)(6) representative, testified that he was aware that the case had been remanded to the ConComm but did nothing to schedule a hearing or determine steps the ConComm was required to take.
After another year-and-a-half delay, Thyng returned to this court and requested an order requiring the defendants to schedule Thyng’s application for a hearing. On January 3, 2008, Judge Brady issued an order stating: “The Conservation Commission offers no reason, other than animosity toward Plaintiff, for not scheduling the matter for hearing. Furthermore, the original decision denying the application was late and therefore of no effect. The Superseding Order of the DEP governs.”
After Judge Brady’s Order, Quincy’s Building Department, specifically defendants Duca and Conlon, engaged in dilatory tactics to prevent Thyng from completing the permitting process before the March 15,2010 expiration of a variance he had obtained from the Quincy Planning Board. Nonetheless, Thyng received the final permit he needed for development of the Property on March 11, 2010.
Throughout the entire process, Thyng alleges, Defendant McCauley, the former mayor and city councilor, made phone calls and personal visits to various city officials and attempted to persuade them to delay or prevent Thyng’s project. These allegations are supported by the deposition testimony of ConComm member and defendant E. James lorio, who suggested that many of Thyng’s delays and obstacles might have been a result of political opposition to Thyng’s project.
Overall, the evidence presented by Thyng suggests a pattern of opposition to a seemingly routine project that caused Thyng to wait ten years to obtain permits that he was entitled to receive. Thyng has presented evidence from which a juiy could conclude that McCauley called in favors to prevent construction of a new home on his street, and that Sargent harbors personal animosity towards him, all of which suggests that this was not a typical local permitting dispute.
DISCUSSION
I. Summary Judgment Standard
Summary judgment is granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). The court views the evidence in the light most favorable to the non-moving party, but does not weigh the evidence, assess credibility, or find facts. Attorney Gen. v. Bailey, 386 Mass. 367, 370-71 (1982).
II. Count 1 — 42 U.S.C. §1983
Section 1983 allows a plaintiff to seek money damages from any person who acted under color of law to deprive the plaintiff of a right guaranteed by the Constitution or by federal law. See 42 U.S.C. §1983; Camilo-Robles v. Hoyos, 151 F.3d 1, 5 (1st Cir. 1998). Section 1983 itself is not a source of substantive rights; instead, it is a mechanism for vindicating federal rights conferred by the United States Constitution and other federal laws. Baker v. McColland, 443 U.S. 137, 145 n.3 (1979). A claim under section 1983 requires the plaintiff to prove two elements: 1) a deprivation of a right protected by the United States Constitution or laws of the United States; and 2) that the party who deprived the plaintiff of that right was acting under the color of law. Gutierrez v. Massachusetts Bay Transp. Auth., 437 Mass. 396, 401 (2002). In this case, Thyng brings section 1983 claims against all of the individual defendants in both their individual and official capacities, as well as claims against municipal entities, the City of Quincy and the Quincy ConComm. His primary claims are premised upon the defendants’ alleged violations of his right to use and enjoy his property and his right to due process.[3]
i. Municipal Liability under Section 1983
‘To make out a case for municipal liability under 42 U.S.C. §1983, the Supreme Court has repeatedly held that liability can be found only ‘where the municipality itself causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under §1983.’ City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989). Thus, a plaintiff must show that a policy or custom of the city led to the constitutional deprivation alleged. Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658 (1978). This requires that plaintiff demonstrate both the existence of a policy or custom and a causal link between that policy and the constitutional harm.” Tambolleo v. West Boylston, 34 Mass.App.Ct. 526, 528 (1993) (internal citations omitted) (emphasis in original).
The summary judgment record contains no evidence suggesting that the alleged deprivation suffered *218 by Thyng was caused by a policy or custom dictated by the City of Quincy. Instead, Thyng appears to pursue this claim based on a theory that the individual defendants acted in a manner so far removed from the ordinary course of business of the City as to deprive him of due process.[4] Because any injury would arise from conduct outside of a custom or policy, summary judgment must be granted in favor of the municipal defendants, i.e. the City of Quincy, the Quincy ConComm, and the persons sued in their official capacities. Smith v. Boston, 413 Mass. 607, 616 (1992) (plaintiff must show pattern of occurrences or similar practice to set out municipal liability based upon custom); Claudio v. Chicopee, 81 Mass.App.Ct. 544, 547, 552 (2012) (defendant municipality entitled to directed verdict on section 1983 claim, where plaintiff produced no evidence of custom or policy causing plaintiffs civil rights violation).
ii. Individual Liability under Section 1983
The individual defendants argue that they are entitled to qualified immunity because the conduct alleged involves discretionary decision making, which is protected conduct under the qualified immunity standard. They reference the fact that the issuance of building permits, Determination of Applicability, and Orders of Conditions all involve evaluation, analysis and interpretation of various laws and regulations.
Even if this were true, it is beside the point. Thyng does not base his claims on faulty reasoning or flawed analysis during the permitting process. Cf. PFZ Props., Inc. v. Rodriguez, 928 F.2d 28, 31 (1st Cir. 1991) (“[R]ejections of development projects and refusals to issue building permits do not ordinarily implicate substantive due process”); Creative Environments, Inc. v. Estabrook, 680 F.2d 822, 833 (1st Cir. 1982) (substantive due process claims in land use context require evidence of “fundamental procedural irregularity, racial animus, or the like”). Instead, Thyng alleges that the ConComm members and other individual defendants abused the decision-making process in order to prevent Thyng from developing the Property at the behest of McCauley, the former mayor and City Council President. This is exactly the sort of “fundamental procedural irregularity” mentioned by the Creative Environments court as sufficient to support a substantive due process claim based on wrongful acts by public officials in land use permitting. See, e.g., Collier v. Harvard, 1997 U.S.Dist. LEXIS 23582 at *14-*28 (D.Mass. March 28, 1997) (allowing plaintiffs substantive due process claim based upon denial of permits to go to trial where one abutter was town official who attempted to influence permitting proceedings). Put another way, Thyng’s section 1983 claim is not a thinly disguised appeal of an adverse land-use decision as in PFZ Props, and Creative Environments; instead, Thyng is attacking procedural irregularities which he says are conscience-shocking. See Mongeau v. Marlborough, 492 F.3d 14, 17 (1st Cir. 2007) (plaintiffs substantive due process claim based in land use dispute required evidence that defendant city government’s actions “shocked the conscience”).[5]
The defendants cite Duarte v. Healy, 405 Mass. 43, 46 (1989), in support of their argument that the tortious conduct alleged amounts to nothing more than discretionary conduct. In Duarte, the Supreme Judicial Court found that defendants were entitled to qualified immunity for implementing and carrying out a new policy of screening fire fighters for illegal drugs by way of a mandatory urinalysis screening. Id. at 44.
The present allegations do not allow for the same analysis as Duarte. Here, Thyng alleges that the defendants steadfastly refused to obey court orders, acted out of spite, and created obstructions in order to prevent Thyng from developing his Property. This was not the creation of a new policy to be applied to many, as in Duarte. Instead, Thyng alleges, it was the selective treatment of subjecting one individual to more delays and obstructions than other applicants, in an effort to wear down his will to develop the Property. While the ConComm may have had the discretion to schedule a hearing on Thyng’s application at a time convenient for its members, it could not simply refuse to provide him a hearing, especially in the face of this court’s order that it do so. See Collier, 1997 U.S.Dist. LEXIS 23582 at *31-*32 (denying town officials’ qualified immunity argument because plaintiffs had “right to be free from government coercion,” which is substantively different than plaintiffs’ right to seek permits).
Another weakness in the position of the defendants is that whether the acts alleged here are discretionary is only one part of the qualified immunity analysis. The law of qualified immunity says that the defendants do not enjoy qualified immunity for any conduct that violated Thyng’s “clearly established” rights. See Duarte, 405 Mass. at 48 (1989) (“the defendants are not liable for their discretionary acts unless their actions violated [plaintiffs] rights that were ‘clearly established’ under the relevant law”). The defendants do not discuss whether Thyng’s rights were “clearly established” at the time of the alleged violation.
The facts laid out in the summary judgment record do not support the individual defendants’ argument that they are entitled to qualified immunity.
III. Count II — The Massachusetts Equal Rights Act — G.L.c. 93, §102
The Massachusetts Equal Rights Act provides that every person in the Commonwealth “shall have ... the same rights enjoyed by white male citizens . . .” G.L.c. 93, §102(a). “Only discrimination that is both purposeful and based on sex, race, color, creed or national origin comes within the reach of the statute.” LaCava v. Lucander, 58 Mass.App.Ct. 527, 535 (2003). Thyng’s claim fails for lack of evidence concerning either of these prerequisites.
*219 First, in his deposition, Thyng acknowledged that he is a white male, and that his last name is Scottish. The defendants, therefore, contend that this claim must be dismissed because Thyng cannot prove discrimination based on sex, race, color, creed or national origin. The defendants are correct. The statute was simply not intended to protect white males.[6]
In addition, Thyng has failed to present any evidence of purposeful discrimination based on sex, race, color, creed or national origin directed towards him. For this reason, judgment must enter for the defendants on Count II of the Second Amended Complaint. See Williams v. Brigham & Women’s Hosp., 14 Mass. L. Rep. 438, 2002 Mass.Super. LEXIS 52, 30-32 (Mass.Super.Ct. 2002) (summary judgment against plaintiff appropriate even where plaintiff falls into protected categories; African American woman’s Equal Rights Act claim fails because it was not supported by evidence showing purposeful discrimination based on race).
IV. Count III — The Massachusetts Civil Rights Act — G.L.c. 12, §§11H, 111
The Massachusetts Civil Rights Act (“MCRA”) is intended to provide a remedy for persons whose rights under state or federal law have been interfered with through threats, intimidation, or coercion. See G.L.c. 12, §§11H, 111. ‘The Legislature enacted [the MCRA] to provide a State remedy for the deprivation of civil rights.” Batchelder v. Allied Stores Corp., 393 Mass. 819, 822 (1985). While the MCRA is more expansive than its federal counterpart, 42 U.S.C. § 1983, because it covers private actions, not simply State actions, it is not intended to be a vast constitutional tort. Id. at 822-23; Bell v. Mazza 394 Mass. 176, 182 (1985).
The MCRA limits the conduct that it covers by requiring that any interference be accomplished by threats, intimidation, or coercion. Id. Accordingly, “[t]o establish a claim under the [A]ct, [Thyng] must prove that (1) [his] exercise of enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion.” Kennie v. Natural Resource Dep’t of Dennis, 451 Mass. 754, 759 (2008) (internal quotations omitted), and cases cited therein.
As a preliminary matter, municipalities are not “persons” under the MCRA and, therefore, cannot be sued under the statute. See Howcroft v. Peabody, 51 Mass.App.Ct. 573, 591-92 (2001); Carroll v. Quincy, 441 F.Sup.2d 215 (D.Mass. 2006). Likewise, public officials must be sued in their individual capacities in order to be found liable under the MCRA. Howcroft, 51 Mass.App.Ct. at 593. The portions of Thyng’s claim seeking to impose liability directly upon the municipality, the Conservation Commission, and individuals in their official capacities cannot survive summary judgment.
In addition, the individual defendants contend that Thyng cannot demonstrate that they engaged in any threats, intimidation or coercion. In his opposition, Thyng concedes that his claim is premised solely upon a coercion theory. Specifically, he alleges that the individual defendants prevented him from exercising his right to use and enjoy his property and his right to due process[7] by engaging in a course of conduct that included misrepresentations, threats, refusals to consider plaintiffs permit application, and refusals to comply with court orders, all in an attempt to coerce him into abandoning his development plans.
The summary judgment record presents sufficient evidence to support Thyng’s contention that the defendants purposefully interfered with his rights to use the Property and to due process in the consideration of his applications for permits. Judge Brady’s earlier finding that the permitting process was delayed solely because of animosity, coupled with Thyng’s evidence that former mayor McCauley was demanding that the project be stymied, creates a plausible basis for a jury to find that the defendants interfered with Thyng’s rights under state law. The more difficult question is whether the summary judgment record contains evidence from which a jury could reasonably conclude that this was accomplished by coercion.
Actionable threats and intimidation under the MCRA “usually require actual or threatened physical force.” However, coercion “is a broader category that may rely on physical, moral, or economic coercion.” Spencer v. Roche, 755 F.Sup.2d 250, 265 (D.Mass. 2010); accord, Buster v. George W. Moore, Inc., 438 Mass. 635, 644 (2003).
For example, in Kennie the plaintiffs applied to the town for a permit to construct a dock in the river abutting their property. Kennie, 451 Mass, at 756. The town’s shellfish constable told the plaintiffs that he was “mandated to do whatever it takes to prevent docks” from being built in the area. When presented with a shellfish survey prepared by the plaintiffs’ consultant showing few shellfish in the area of the proposed dock, the shellfish constable indicated that he “could take care of that.” According to the plaintiff/applicants, the shellfish constable followed through on these statements by placing store-bought shellfish in the river near the plaintiffs’ property and then conducting a new survey. Id. at 760-61.
The Supreme Judicial Court held that the potentially coercive statements, followed by and coupled with the wrongful acts that carried out the speaker’s intent to harm the plaintiffs, gave rise to the possibility that the town official’s actions were coercive. Id. at 763-64. "While certain statements may amount to “posturing” or “[h]uffing and puffing,” the court found that when coercive statements are made by someone with official status and coupled with “actions in furtherance of [the] statements,” then summary judg *220 ment for the defendant municipal officials is inappropriate. Id. at 765 (internal citations omitted).
In Kennie, the Supreme Judicial Court discussed at some length its decision two decades earlier in Pheasant Ridge Assocs. Ltd. P’ship v. Burlington, 399 Mass. 771, 781-82 (1987). In that case, a developer filed an application to construct mixed-income housing under M.G.L.c. 40B, §§20-23, causing a firestorm of opposition. Again, the pattern was that municipal officials threatened to do what it took to stop the project, followed by municipal action, in that case to take the developer’s land by eminent domain. Kennie, 451 Mass. at 764, discussing Pheasant Ridge, 399 Mass. at 772-73 (“Two town selectmen told the developer that they would take any action necessaiy to stop the development and the town voted to take the developer’s property by eminent domain. This court held that the developer’s civil rights claim could not be resolved on a motion for summaiy judgment because it was for a trier of fact to determine ... whether [the selectmen’s words] represented actionable coercion” (internal citations omitted)).
Thyng’s theoiy here rests on the same fact pattern found in Kennie and in Pheasant Ridge. Thyng has presented evidence that Sargent made coercive statements, and then each defendant had a role in inflicting the consequences mentioned by Sargent and causing the ultimate deprivation of his rights. Specifically, there is evidence that, while acting as ConComm administrator, Sargent said that she would stop the development of the Property; that she would not schedule a hearing because Thyng was “suing her”; and that she would “get him” for seeking relief at DEP when the ConComm refused to schedule a hearing on his NOI. Then, Thyng alleges, these statements were coupled with actions (or inactions) by the other defendants which demonstrated that the statements were not idle posturing. As in Kennie and in Pheasant Ridge, a jury must determine whether Sargent’s words, coupled with the later actions of the individual ConComm members, constituted coercion. A jury could reasonably reach the conclusion that the individual ConComm members acted to support Sargent’s coercive tactics, or were at least complicit in them, given the fact that it took multiple court orders before Thyng received his ConComm hearing.
Similarly, Thyng has presented evidence that McCauley indicated to other defendants that they should ensure that a house was not built on the Property, and Thyng suggests that these defendants then acted in accordance with McCauley’s instructions. In Kennie, the Supreme Judicial Court overturned the Superior Court’s order granting summaiy judgment because genuine issues of material fact existed as to whether the shellfish constable’s words and conduct amounted to a violation of the MCRA. Id. at 755. Likewise, the words and conduct apparent from the summary judgment record here indicate that a trial is necessaiy to determine the involvement of the various individual defendants in interfering with Thyng’s right to due process and the use and enjoyment of the Property. Tortora v. Inspector of Bldgs. of Tewksbury, 41 Mass.App.Ct. 120, 122-23 (1996) (reversing grant of summary judgment on plaintiffs’ MCRA claims where record required “remand for a trial to determine whether the defendants crossed the line separating legitimate exercise of their authority from illegal harassment or impairment of the plaintiffs right to use and enjoy their property”); but see Freeman v. Planning Bd. of West Boylston, 419 Mass. 548, 565-66 (1995) (overturning plaintiffs juiy verdict under MCRA because a local planning board “should be allowed to address matters within its realm of responsibility without exposure to liability under the Act eveiy time its actions are overturned”).
The facts in this summaiy judgment record— namely Sargent’s words, followed by the numerous unexplained delays and the suggestion of political favors — require that a juiy determine whether each individual defendant interfered with Thyng’s rights through coercion. Therefore summaiy judgment must be denied as to the individual defendants in their individual capacities.[8]
V. Statute of Limitations
Finally, the defendants argue that Thyng’s claims must be dismissed because none of the alleged conduct occurred within the applicable statute of limitations period. Thyng filed his Complaint on August 6, 2010 and the parties agree that the applicable statute of limitations for all of Thyng’s claims is three years. The defendants argue that any conduct that occurred prior to August 6, 2007 must be excluded from the court’s analysis and that if Thyng knew of his cause of action before August 6, 2007, then the Complaint should be barred by the statute of limitations.[9] This approach would require me to view each isolated occurrence in a vacuum, which would miss the plaintiffs larger contention that, collectively, each of these small events or episodes cumulatively deprived the plaintiff of his right to due process and right to use and enjoy his property.
In general, “the question when a plaintiff knew or should have known of his cause of action is one of fact which in most instances will be decided by the trier of fact.” Riley v. Presnell, 409 Mass. 239, 240 (1991). The parties dispute when it was that Thyng learned he had been harmed by the defendants’ conduct. The defendants contend that Thyng knew of McCauley’s alleged misconduct in November of 2005 but Thyng argues that he did not learn that McCauley had attempted to influence the permitting process until November 2007. On this record, it is best that a trier of fact determine if Thyng’s claims are barred by the statute of limitations.
*221 ORDER
For the foregoing reasons, Defendants’ Motion for Summary Judgment is ALLOWED IN PART. Count II of the Second Amended Complaint, the claim under G.L.c. 93, §102, is dismissed. The claims under Count I (42 U.S.C. §1983) and Count III (G.L.c. 12, §111) are dismissed as to the City of Quincy, the Quincy Conservation Commission, and the individual defendants in their official capacities. The claims under Counts I and III against the individual defendants in their individual capacities survive.

It is unclear from the record whether Sargent was referencing Thyng’s appeal of the ConComm’s local ordinance decision that resulted in Judge Brady’s remand or the DEP appeal process. In any event, there is nothing in the record suggesting that Thyng was suing her personally at this juncture.

Nhyng also suggests that his right to equal protection may have been violated because he was treated differently than other, similar permit applicants, a claim perhaps founded on Village ofWillowbrook v. Olech, 528 U.S. 562 (2000), a theory I need not reach.

In Thyng’s Opposition and Complaint, he contends that “there is a pattern or practice of illegal action that is known of and acquiesced in by the City of Quincy, its mayor and other high officials . . .” Pl.’s Opp’n 17; Second Am. Compl. ¶67. But while Thyng’s evidence, if accepted by a jury, would support his theory that his rights were violated, he has proffered no evidence that the City of Quincy had a policy or custom of selectively delaying building projects based upon the whims of an ex-mayor.

For a review of judicial decisions applying the “shocks the conscience” standard in the land use context, inspired by the colorful description of that standard by a Massachusetts federal district court judge, see Wilson, Paul D. and Noah C. Shaw, The Judge as Cartoon Character Whose Hat Flies Into the Air: the “Shocks the Conscience” Standard in Recent Substantive Due Process Land Use Litigation, in Merriam, Dwight, ed., At the Cutting Edge 2010 (Chicago: American Bar Association, 2011), first appearing at 42 Urb. Law. 677 (2010).

At the hearing on this motion, Thyng suggested that a potential buyer of the Property was Asian and that town officials did not want an Asian buyer to purchase the Property. Even assuming that the legislature intended to create a claim for a white male plaintiff based on his association with a person in a protected category, this argument is not supported by the summary judgment record.

As in Kennie, Thyng’s right to use and enjoy the Property is constitutionally secured by arts. 1, 10, and 12 of the Declaration of Rights and the Fourteenth Amendment to the United States Constitution. Kennie v. Natural Resource Dep’t of Dennis, 451 Mass. 754, 760 (2008); see Haufler v. Zotos, 446 Mass. 489, 504 (2006). Included within this concept is “the right to own land and to use and improve it according to the owner’s conceptions of pleasure.” Kennie, 451 Mass. at 760, quoting Brett v. Building Comm’r of Brookline, 250 Mass. 73, 77 (1924). Accordingly, Thyng was pursuing a constitutionally protected right to request the permits that he sought, and the defendants do not contend otherwise.

Qualified immunity under the MCRA is reviewed in the same manner as section 1983. See Duarte v. Healy, 405 Mass. 43,46-48 (1989). As discussed above, the defendants’ cursory qualified immunily argument provides no support for their contention that the individual defendants were engaged in discretionary decision making when they, for example, ignored court orders. Likewise, if their respective decisions were motivated by political favors, or interfered with clearly established rights of Thyng as permit applicant, then they would not be entitled to immunity under the statute.

The defendant ConComm members also claim that no allegations are lodged against them for acts they allegedly committed after they denied Thyng’s application in June of 2004. However, this argument ignores the fact that the Con-Comm was required to re-hear Thyng’s application after remand from this court, and did not do so. This refusal took place during the statute of limitations period.